# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Technology Systems, Inc. ) ASBCA No. 59577
)
Under Contract Nos. N00039-07-C-0006 )
N00014-07-C-0236 )
N00014-07-C-0340 )
N41756-05-C-4775 )

APPEARANCE FOR THE APPELLANT: Mr. Charles J. Benton
President/Owner

APPEARANCES FOR THE GOVERNMENT: E. Michael Chiaparas, Esq.
DCMA Chief Trial Attorney
Debra E. Berg, Esq.
Trial Attorney
Defense Contract Management Agency
Boston, MA

## OPINION BY ADMINISTRATIVE JUDGE PROUTY

This appeal, brought by Technology Systems, Inc. (TSI), challenges the final decision of the Defense Contract Management Agency (DCMA) administrative contracting officer (ACO) to follow the recommendation of the Defense Contract Audit Agency (DCAA) and disallow certain expenses used to calculate its indirect cost rates for fiscal year (FY) 2007 as well as some direct costs. In addition to certain cost-specific arguments, TSI argues, in general, that the disallowed expenses had not been questioned by prior DCAA audits and that it relied upon this to its detriment because it did not preserve what DCAA would have considered to be necessary evidence for the FY 2007 costs in question. The amount in dispute is the $159,303 that the government seeks to recoup from TSI after finding the already-paid costs to be unsupported.

Judge Clarke heard this appeal and, for reasons detailed in his dissenting opinion and discussed further below, is of the view that TSI is entitled to significant relief through an application of the retroactive disallowance doctrine and as a result of the government's past course of conduct, and that it is due some other relief for different reasons. Though not unsympathetic to TSI, we respectfully disagree with our colleague and deny portions of the appeal that he would sustain (although also granting it in part): the DCMA-challenged costs were largely not allowable and, without more, an auditor's failure to challenge a cost in one audit does not require application of the principle of retroactive

disallowance nor does it constitute a course of conduct precluding the government from disallowing the costs in subsequent audits.

## FINDINGS OF FACT

TSI is a small technology business that, while operational,[1] conducted research and development of software systems relating to new ways for ship navigation (tr. 2/227). TSI employed approximately 20 people (tr. 2/193), including three executives: Mr. Charles Benton, chief technology officer, president and sole owner (tr. 2/229-30); Mr. Maxwell Fletcher, chief financial officer (CFO) (tr. 2/117); and Mr. Thomas Zysk, chief operating officer (COO) (tr. 2/73, 76, 102). Mr. Benton started TSI in 1985 and it began contracting with the government in 1987 (tr. 2/230).

During the time relevant to this appeal, TSI had four cost-plus-fixed-fee (CPFF) contracts for research and development with the Navy: Contract Nos. N00039-07-C-0006 (0006), N00014-07-C-0236 (0236), N00014-07-C-0340 (0340), and N41756-05-C-4775 (4775)[2] (R4, tabs 1-3, 16 at 268, tab 17 at 269). These contracts contained standard clauses from the Federal Acquisition Regulation (FAR) that governed the payment of their costs by the government.[3] In a typical CPFF contract, subject to the standard FAR clauses included here, the government compensates a contractor for two types of costs: direct and indirect. FAR 52.216-7(b). Direct costs, as suggested by the name, are those costs directly incurred for performing task orders on a contract. *See* FAR 2.101, Definitions, *Direct Costs*. Indirect costs are overhead costs that the company incurs during the time of contract performance that cannot be allocated to a single "cost objective." FAR 31.203(b). They are allocated to the contract on a *pro rata* basis, based upon the direct costs incurred during the base time period, typically the contractor's fiscal year.[4] FAR 31.203(b)-(g); *see also*

---

[1] TSI ceased operations in August 2014, but continued to exist "on paper" to permit this litigation (tr. 2/230).

[2] Contract 4775 was identified as a classified contract and a copy is not in the record (R4, tab 53 at 910).

[3] Contracts 0006, 0236 and 0340 contained the following standard clauses: FAR 52.215-2, AUDIT AND RECORDS – NEGOTIATION (JUN 1999); FAR 52.216-7, ALLOWABLE COST AND PAYMENT (DEC 2002); FAR 52.233-1, DISPUTES (JUL 2002); FAR 52.242-1, NOTICE OF INTENT TO DISALLOW COSTS (APR 1984); FAR 52.242-3, PENALTIES FOR UNALLOWABLE COSTS (MAY 2001); and FAR 52.244-2, SUBCONTRACTS (AUG 1988), (contract 0006) or 1998 (contracts 0236, 0340) (R4, tabs 1-3). We infer that contract 4775 also had these required clauses.

[4] Indirect costs are billed at a percentage rate which is based on the notion of dividing the pool of such costs for a year by the company's direct expenses for the year. To provide a rudimentary example, if a company incurred $50,000 in allowable overhead costs for a year and $100,000 in direct costs for the same year, its indirect cost rate would be 50%, which would lead to the invoicing of $500 of

2

KAREN L. MANOS, GOVERNMENT CONTRACT COSTS & PRICING, § 7:A:2 (2003). Whether a cost claimed by the contractor is compensated by the government is dependent upon both whether the costs claimed are allowable under the contract (which is controlled by the FAR) and whether they are satisfactorily proved to have been incurred as shown in the records maintained by the contractor. FAR 52.216-7(b)(1)(ii)(F).

In any event, a contractor with a CPFF contract generally regularly invoices the government for its direct and indirect costs throughout contract performance and is paid by the CO if he or she is provisionally satisfied that the costs are allowable and have been incurred (tr. 2/21-22). FAR 52.216-7(a)(1). Indirect costs are billed and initially paid at estimated rates. FAR 52.216-7(e). Often these estimated rates are submitted to DCAA prior to billing for review and provisional approval, but this does not always happen (tr. 1/28-31).

Within six months of the end of the contractor's fiscal year, it is required to submit to the CO[5] and the CO's auditor (here, the DCAA) a "final indirect cost rate proposal" (ICP), which is based on the actual indirect costs incurred by the contractor during the time period of that fiscal year. FAR 52.216-7(d)(2)(i)-(iii). DCAA auditors typically select those portions of the ICP that appear most ripe for review and concentrate their review upon them because it would be impractical to closely audit the entirety of the IPC (tr. 1/21-22, 24). Upon completion of its review, the DCAA shares its audit results and recommendations with the CO, who is required to make an independent determination of whether to accept them (tr. 1/253). If costs are questioned, the CO has authority to negotiate with the contractor regarding which costs would be approved. FAR 52.216-7(d)(3). After the indirect cost rates are agreed to between the contractor and the government (or, absent agreement, the government imposes its own rates upon the contract), the contractor is required to update the prior billing to reflect the final indirect cost rates. FAR 52.216-7(d)(2)(v).

*DCAA/DCMA Audit History Prior to FY 2007*

Ms. Winefield, a DCAA supervisory auditor, testified that DCAA conducted full audits of TSI's ICPs for FYs 1998 – 2003 and for FY 2006 (tr. 1/28). The FY 2001 audit questioned several costs but it primarily questioned $70,072 in the Professional Fees Cost Element claimed in overhead and in G&A[6] for Messrs. Kemper, Ring and Wilson (ex. G-1 at 4-5, 9-11). These costs were questioned because, among other

---

indirect costs for every $1,000 in direct costs charged to the government. Further complicating matters, contractors often (and appropriately) establish separate pools to associate particular overhead costs with different categories of direct costs such as labor and materials. FAR 31.203(c).

[5] The role of the CO here is interchangeable with the role of the ACO.

[6] "G&A" refers to "general and administrative" costs.

reasons, TSI failed to provide evidence supporting the work performed by the consultants, including "actual work product" (*id.*; *see also* tr. 1/84). The FY 2001 audit resulted in negotiations between the ACO and TSI, and a rate agreement was achieved (tr. 2/256). For FYs 2002 through 2006, DCAA/DCMA did not question costs and accepted TSI's indirect rates without change (tr. 2/60-63; R4, tab 6(a) at 72, tab 70 at 1554). DCAA conducted a "desk review" for FYs 2004 and 2005. A desk review is not a full audit. (Tr. 1/16-17, 26-28) The desk review for TSI's FY 2005 ICP included the statement, "We determined that no significant costs were questioned in prior years and that no indicators of audit risk had been identified" (app. supp. R4, tab 100 at 2904). The FY 2006 audit was a full audit (tr. 2/174). This audit included the statement that, "In our opinion, the contractor's indirect rates are acceptable as proposed" (app. supp. R4, tab 101 at 6105).

*The FY 2007 Audit and Decrement Memorandum*

TSI's FY 2007 ICP was submitted on or about 25 June 2008 (R4, tab 15 at 227), and DCAA began its review of this ICP in the fall of 2008 (tr. 1/36). Ms. Waller and Ms. Pitts were the DCAA auditors conducting the audit (tr. 2/161; R4, tab 53 at 626).

Shortly after the audit began, TSI's relationship with Ms. Waller ran into difficulties. At the hearing, Mr. Fletcher testified that Ms. Waller "lost her temper" during a meeting held on Friday, 17 October 2008 (tr. 2/162; R4, tab 109). Mr. Benton, who was not present at the meeting, complained about it in a 20 October 2008 email to ACO Murray[7] (app. supp. R4, tab 103). Mr. Fletcher testified that he called ACO Murray complaining about Ms. Waller and that, in response, ACO Murray stated that TSI would not get an objective audit from Ms. Waller and that she (ACO Murray) would see that TSI got another auditor (tr. 2/163). A TSI-requested meeting with the government about Ms. Waller was subsequently held on 12 November 2008, with ACO Murray and Ms. Waller among the attendees. TSI asked that Ms. Waller be replaced (R4, tab 107 at 1), but the government declined to do so (tr. 2/164; R4, tab 107 at 2-3). ACO Murray also denied any memory of promising TSI that it would be getting a new auditor to replace Ms. Waller (R4, tab 107 at 3).[8]

Ms. Waller submitted her draft audit for peer review on 27 April 2009 (R4, tab 53 at 552). At this point, outside concerns intervened, and DCAA ordered a halt to all incurred costs audits agency-wide so that it could focus on pricing audits that were holding up awards of contracts across the government (tr. 1/38, 42-43). When TSI's incurred cost audit was stopped, Ms. Waller had completed a substantial amount of the work. Her draft audit questioned over $360,000 in direct and indirect

---

[7] ACO Murray was close to retirement and was later replaced by ACO Cuellar (app. supp. R4, tab 122 at 1; tr. 1/227).

[8] Neither party called Ms. Waller as a witness at the hearing.

4

costs (R4, tab 53 at 559-608). These questioned costs produced recalculated indirect cost rates, which we set forth, along with TSI's ICP, in Table 1 below:

**TABLE 1:**

|  | Claimed by TSI | Draft audit recommended |
|---|---|---|
| OH[9] Rate | 127.64% | 92.48% |
| G&A Rate | 18.40% | 12.02% |
| Material OH Rate | 1.05% | 0.00% |

(R4, tab 53 at 557)

Some four years later, in 2013, DCAA grew concerned about the pending running of the statute of limitations acting to limit any potential recovery of mischarged expenses, and resumed its audit of TSI's FY 2007 ICP (tr. 1/43). In April 2013 Ms. Cote, a senior DCAA auditor, was assigned to review the status of the TSI audit (tr. 1/44, 46; R4, tab 48). Ms. Cote submitted her findings in July 2013. She determined that more information was needed from TSI to complete the audit. (Tr. 1/44-47; R4, tabs 49, 50) Mr. Darcy, another DCAA senior auditor, was then assigned to finish the TSI audit (tr. 1/48).

By letter dated 18 March 2014 to ACO Cuellar, DCAA wrote that it was unable to meet the required audit date[10] and was withdrawing from "our engagement to audit the subject [TSI's] incurred cost proposal" (app. supp. R4, tab 136). The primary roadblock to a complete audit, apparently, was DCAA's inability to complete "additional [transaction] testing" of TSI's direct labor rates (tr. 1/52). In any event, DCAA agreed to provide "non-audit" service to assist DCMA in determining final indirect cost rates for TSI in FY 2007 (tr. 1/173-74, 230-32; app. supp. R4, tab 136). Also on 18 March 2014, DCAA provided ACO Cuellar a "decrement memo" itemizing the costs it questioned (tr. 1/52-53; R4, tab 4). The memorandum stated, "Providing this information does not constitute an audit or attestation engagement under generally accepted government auditing standards" (R4, tab 4 at 2).

The recommended rates in the decrement memo, compared to the rates originally requested by TSI, are reflected in Table 2 below:

---

[9] OH represents labor overhead costs.

[10] DCAA calculated that the six-year limitation period would run out on 25 June 2014 (tr. 1/213).

5

**TABLE 2:**

|  | Claimed by TSI | Memo Recommended |
|---|---|---|
| OH Rate | 127.64% | 106.26% |
| G&A Rate | 18.40% | 15.80% |
| Material OH Rate | 1.05% | 1.05% |

(R4, tab 4 at 48-49)

The decrement memo did not question as many costs as Ms. Waller's draft audit had (*compare* Tables 1 and 2 above and R4, tab 4 to R4, tab 53; *see also* R4, tab 59 at 1466 (Mr. Darcy explaining, in a spreadsheet emailed to ACO Cuellar on 14 April 2014, that he was not taking as much of a "hard line" on certain labor costs as Ms. Waller had) and tr. 1/ 218-19 (same)).

*The ACO's Determination*

On 4 April 2014, after she received DCAA's decrement memo, ACO Cuellar emailed Mr. Benton, providing him with a copy of the decrement memo, requesting any additional data that he might want to submit, and offering to set up a time to meet (tr. 1/233-34; R4, tab 5). ACO Cuellar's email offered to close-out the action without assessing a penalty if TSI would accept DCAA's questioned costs (tr. 1/235-36).

By email dated 23 April 2014 to ACO Cuellar, Mr. Benton stated that he did not accept the offer, argued that DCAA had not questioned similar costs in the past, and submitted documents aimed at supporting TSI's position (tr. 1/237-38; R4, tabs 6, 6(a)-(g)). ACO Cuellar acknowledged TSI's "non-acceptance of the Government's offer" in an email sent on 6 May 2014, stating in part:

> We understand your argument that DCAA has historically not questioned these costs; however, that does not mean DCAA deems those costs to be allowable. We here at DCMA cannot speak for the DCAA auditor(s) that performed the reviews, nor can we speak for the sampling methodology used by DCAA. Our job will be to address the audit as written. If you are able to substantiate the costs with the required documentation, we will reinstate the costs. If not, we have to sustain the costs.

(R4, tab 7; tr. 1/238) Mr. Benton replied, submitting some additional information on 12 May 2014, but ACO Cuellar considered most of this information to have been already provided to DCAA. She was, however, able to allow some previously-disallowed costs based on the new information (tr. 1/237-40; R4, tabs 9, 9(a)-(e)). ACO Cuellar testified

6

that she continued to attempt to negotiate with TSI, requesting additional documentation such as evidence of approval of subcontracts by the ACO, meeting notes, trip reports, bonus plan information, etc. (tr. 1/242-45). By email dated 15 May 2014 to ACO Cuellar, Mr. Benton provided a statement to the effect that TSI was no longer interested in negotiations (tr. 1/245; R4, tabs 13, 13(a)). In the email, Mr. Benton complained that DCAA had significantly altered its view of the allowability of its costs in 2007 compared to previous years (R4, tab 13(a) at 212-13).

ACO Cuellar issued a contracting officer's final decision (COFD) on 23 June 2014, setting the final determination of TSI's rates and asserting a government claim for $159,303 (tr. 1/153; R4, tab 16). To arrive at this figure, she recalculated the overhead and G&A costs by decreasing their respective pools by the costs that she found disallowable (R4, tab 16 at 256-58, 263). She then used the revised allowable cost pools to generate revised overheard and G&A rates, which are reflected in Table 3, below:

**TABLE 3:**

|  | Claimed by TSI | ACO Determined |
|---|---|---|
| OH Rate | 127.64% | 109.88% |
| G&A Rate | 18.40% | 15.83% |
| Material OH Rate | 1.05% | 1.05% |

(*Id.* at 263)

ACO Cuellar then multiplied the allowable direct costs (which had also been decreased by questioned costs) by the difference in the revised indirect cost rates, and added the unallowable direct costs, which summed to the $159,303 claimed (R4, tab 16 at 263-64).

We now turn to a closer examination of the cost components disallowed by the ACO.

*Disallowed Components of (Labor)[11] Overhead Costs*

The ACO disallowed four price components that were associated with the Overhead cost pool: professional fees to Strategic Marketing Innovations (SMI); the expensing of computer supplies; conferences; and "fringe benefits" (R4, tab 16 at 257). We examine each in turn.

---

[11] Often the parties and the documents in this appeal refer to an indirect cost pool of "overhead" costs, which is separate and apart from the G&A and Material Handling indirect cost pools. Although it is not an issue in this appeal, this nomenclature can be confusing. The "overhead" indirect price pool refers to a price pool that TSI tied to direct labor costs (*see* R4, tab 6(a) at 72; *see also* ex. G-1 at 2).

*Professional Fees to SMI*

SMI was a consultant hired by TSI to provide it with both marketing and lobbying services (tr. 2/241-42). It had separate agreements with TSI for each (*see* R4, tab 53 at 1088, 1089), and invoiced TSI separately for each (*see id.* at 1134-47). ACO Cuellar disallowed the $51,340 claimed by TSI for the marketing services provided by SMI on the grounds that TSI did not provide enough documentation to permit an understanding of the work performed nor did it provide the "work products" and other items that the ACO believed were required in accordance with the provisions of FAR 31.205-33(f)(2) and (3) (R4, tab 16 at 258).

*Computer Supplies Expensed*

TSI "expensed" $26,198 in computer supplies for the 2007 fiscal year (R4, tab 16 at 258). The ACO disallowed this expense because depreciation over a multi-year period was deemed more consistent with TSI's past practice and thus more appropriate (*id.* at 258-59). Moreover, $18,840 of these computer expenses claimed by TSI had been claimed as depreciable assets in TSI's 2007 tax filings, indicating to the ACO that they should not have been "expensed" (*id.* at 259).

*Conferences*

The ACO disallowed $2,300 in claimed entertainment expenses for a meal that was not related to company business (R4, tab 16 at 259). TSI concurred with the ACO on this matter, which is no longer in dispute (*id.*).

The ACO also disallowed $304 in per diem for conference attendance because it was more than permitted in the Joint Travel Regulations (JTR) (R4, tab 16 at 259).

*Fringe Benefits (Bonuses for TSI Executives)*

The ACO disallowed $29,967 in claimed compensation that TSI used as bonuses for its top three executives (TSI allocated $25,698 of this money to the Overhead pool with the remaining $4,269 being allocated to the G&A pool) (R4, tab 16 at 259). The basis for the ACO's decision was that TSI allegedly did not provide documentation to demonstrate an agreed-upon bonus plan, nor sufficient evidence to document the basis of its awards (*id.*). The ACO also disallowed some of the bonuses because they were paid in March 2008, in the fiscal year after FY 2007, which is the subject of this ICP (*id.* at 260).

8

*Disallowed Components of G&A Costs*

The ACO disallowed four components of G&A costs: professional fees; conferences; fringe benefits (a portion of the executive bonuses mentioned in the Labor Overhead pool above); and "B&P Overhead" (R4, tab 16 at 257). Again, we explain these in more detail below.

*Professional Fees (Primarily Attorney Fees)*

TSI expensed $39,060 in professional fees in FY 2007 that were disallowed by the ACO (R4, tab 16 at 260). Of this amount, $34,429 was to a law firm for expenses incurred in 2002-2005 when TSI was being criminally investigated by the government, not FY 2007; $1,000 was to the same law firm for preparation of Mr. Benton's income taxes; $706 was to the law firm for work involving the sale of a different company and for corporate database updates for a new company, which the ACO stated was disallowed by the FAR; and the remaining $2,925 was money paid to Mr. Charles Wilson for professional services that he provided to TSI (*id.*). The ACO also noted that the $34,429 paid to the law firm for expenses during TSI's investigation would be reduced by 20% even if it were allowable because the FAR limits recovery of such costs to 80% of those incurred (*id.* at 260-61).

TSI does not appear to dispute the ACO's finding that $1,706 in billing by the law firm was for matters not recoverable; nor that the law firm's representation of TSI during the criminal investigation needed to be discounted by the FAR-mandated 20%; it does, however, assert that it should be eligible for the (20%-discounted) money paid to the law firm because it was improper for it to seek payment until after the criminal investigation was closed (R4, tab 6(a) at 77). TSI also argued that Mr. Wilson had long provided useful advice to the company at a favorable rate and that DCAA had not questioned his billings in the past (R4, tab 6(a) at 78).

*Conferences*

The ACO disallowed $577 in claimed travel expenses that, she claimed, exceeded the maximum allowable per diem rates for lodging and meals (R4, tab 16 at 261).

*Fringe Benefits*

This is the same matter involving executive bonuses that is referenced with respect to questioned Overhead costs, above, and it sums to $4,269 (R4, tab 16 at 257, 261).

9

*B&P Overhead*

The ACO did not elaborate (and this cost component was barely touched upon at the hearing), but the basis of this decrement was that labor used for bids and proposals (B&P) had been charged at a higher overhead rate than the amount the ACO found appropriate (R4, tab 16 at 261). The difference summed to $2,417 (*id.*).

*Disallowed Direct Costs*

There were some direct costs that were disallowed by the ACO as well. The ACO disallowed $1,074 of direct costs claimed under contract 0006 because the travel per diem rates sought by TSI exceeded those in the JTR (R4, tab 16 at 261). The ACO disallowed $466 of direct costs claimed under contract 0236 for similar reasons (*id.*), and disallowed an additional $2,661 on that contract because it was for the use of a subcontractor for which TSI had not sought prior approval from the ACO (*id.* at 261-62). Finally, the ACO disallowed $1,986 of direct costs claimed under contract 0340 for exceeding the per diem rates in the JTR and an additional $28,568 for the use of a subcontractor without prior approval (*id.* at 262).

*The Appeal*

TSI timely appealed the 23 June 2014 final decision by letter dated 17 September 2014. The Board docketed the appeal as ASBCA No. 59577 on 18 September 2014.

*The Evidence Presented at the Hearing and Our Factual Conclusions*

As reflected by the approach taken in Judge Clarke's dissenting opinion, the evidentiary case advanced at the hearing focused less upon whether the particular decisions taken by the ACO were supported by the facts and more about whether the DCAA auditor had so changed the government's approach to TSI's proposal as to be unfair (*see, e.g.*, app. br. at 1). There was, however, evidence presented about some of the particulars of the questioned costs, which we will also discuss below.

*Evidence Regarding the Differences in the Audits Previous to the 2007 ICP*

TSI advances two somewhat related factual allegations that are relevant to its course of conduct legal theory, which we will discuss shortly: first, that the DCAA auditor who performed the initial work on the FY 2007 ICP audit was, for some unstated reason, biased against TSI; and second, that the DCAA had been much easier on it in past audits (app. br. at 3-5; app. reply br. at 10-11). In testimony presented by TSI, Mr. Fletcher, its CFO, characterized the first DCAA auditor, Ms. Waller, as having been "on a witch hunt" (tr. 2/165). Moreover, as discussed above, there was ample evidence of friction between Ms. Waller and TSI and early indications from TSI

10

that it did not believe that it would get a "fair" audit from Ms. Waller. Nevertheless, the evidence also demonstrates that the preliminary work performed by Ms. Waller was not the end of the story, given the change in questioned costs demonstrated most clearly by Tables 1, 2, and 3 above. Moreover, the ACO credibly testified that her decisions regarding which costs to question were made independently (tr. 1/251), which is consistent with the back-and-forth which she attempted with TSI prior to issuing her COFD. We need not delve into these circumstances any further due to the fact that TSI, itself, has "concede[d]" that its claim that the COFD should be set aside due to lack of auditor independence "cannot be sustained" (app. br. at 3).

With respect to the allegation that DCAA had questioned fewer costs in prior audits, as discussed above, the evidence supports this contention (notably, the findings in the audits for FYs 2002-2006 and ACO Cuellar's 6 May 2014 email implicitly conceding the point), but the factual record is ambiguous, at best, with respect to the meaning of that fact. First, as we earlier noted, there is uncontested evidence that DCAA *did* question a substantial portion of professional costs in the FY 2001 ICP audit, and we specifically find that the government questioned some of TSI's professional services costs in its FY 2001 ICP audit on the basis that TSI failed to substantiate[12] them, including failing to provide any work product. Second, a number of the expenses questioned in the FY 2007 ICP audit were presented for the first time in that proposal, leaving no track record by DCAA with respect to such costs. These issues include the attorney fees, the executive bonuses, and the complete expensing of the computers. Notably, we have searched the evidentiary record for any indication that DCAA, the ACO, or any other person representing the government ever communicated to TSI that its incurred costs could be considered to be substantiated or proved at any different standard than that set out in the FAR; that anybody from the government had ever told TSI, specifically, that the proof that it submitted with prior ICPs constituted adequate substantiation for the expenses; or that any such persons had ever told TSI that no proof beyond what it had previously provided in its ICPs would ever be required by the government. There is, quite simply, no such evidence in the record. Finally, we note that Mr. Fletcher, TSI's CFO, testified that he understood that DCAA did not examine all the costs in any given ICP (tr. 2/175), which cuts against any inference that failure to challenge costs in a particular year constitutes an indication that the government finds the cost to be allowable.

---

[12] The term, "substantiate," is not found in the relevant portion of the FAR and, is also absent from the COFD (*see* R4, tab 16). Nevertheless, the government's correspondence with TSI (*see* R4, tab 7) and its COFD indicate that the word is meant to be interchangeable with "provid[ing] adequate support" (*e.g.*, R4, tab 16 at 258, 260) or "sufficient evidence" (*id.* at 259), which we find to be appropriate.

*Evidence Relating to Specific Costs*

We now turn from the general to the specific and make factual findings with respect to the components of the COFD.

*Marketing Consulting Costs Paid to SMI*

The Rule 4 file contains invoices from SMI for every month of 2007, breaking out, by the hour, what conferences that it attended on TSI's behalf; who it met with; and the topics of conversation (R4, tab 20). The Rule 4 file also contains the marketing consulting agreement between SMI and TSI (R4, tab 53). This agreement includes the statements that SMI will be expected to "[p]rovide position papers and relevant data on issues as required" and "[p]rovide a monthly report on SMI marketing and business development activities related to TSI projects" (R4, tab 53 at 1092). There is no evidence before us, however, of any "work product" from SMI, nor are there any minutes of meetings or "collateral memoranda and reports."

At the hearing, Mr. Zysk, TSI's COO, testified that he was the primary point of contact for SMI regarding marketing matters and that he was not involved in lobbying (which is a disallowed cost) (tr. 2/85-88). Mr. Zysk further testified that his telephone conversations with SMI provided him the information that he needed from SMI to do his work and that waiting for more formal write-ups would have been unnecessary and taken too much time (tr. 2/86). Given Mr. Zysk's unchallenged and credible testimony and the details contained in the invoices, we find that there is no reason to believe that SMI charged TSI for lobbying or other unallowable costs in the guise of its fees for marketing consulting. We also find that the details contained in the SMI invoices are adequate to support a finding that SMI worked the hours charged.

*The Expensing of Computers*

TSI's CFO, Mr. Fletcher, testified regarding the depreciation of computers. According to Mr. Fletcher, some computers were for research and were "taken apart, components soldered on, sensors added in" and built into systems that would go out on vehicles/boats for testing (tr. 2/131, 205). They were "heavily modified" (tr. 2/221-22). After testing was complete the computer was "of no use" to TSI and it was "expensed" (tr. 2/131-32). Mr. Fletcher also testified that TSI also bought computers that were used on desks for routine office work and those computers were capitalized/depreciated (tr. 2/132) in contrast to the computers that were consumed in the research work that were expensed (tr. 2/133-34).

Prior to 2007, there was no evidence that TSI had ever completely expensed its computers in one year (tr. 1/88). Indeed, TSI's books included accounts referencing continued depreciation of computers over multiple years that included FY 2007 (e.g.,

TSI purchased a laptop in 2004 and continued to write off its depreciation into 2007, even while it completely expensed similar laptops bought in 2007) (tr. 1/89-90). In 2007, however, TSI did take advantage of "IRS Code Section 179," which permits small businesses to fully expense an asset (tr. 1/88).

As far as we can tell, TSI completely expensed *every* computer that it purchased in 2007 in its FY 2007 ICP, and explained its practice to the ACO by asserting that it was a "leading edge software Research and Development firm" for which most computing equipment was obsolete within a year of purchase (*see* R4, tab 6(a) at 75). In this communication, TSI made no mention of the heavy modifications that allegedly made the computers useless after a year (*id.*). Based upon the evidence before us, we conclude that some of the computer equipment completely expensed by TSI was likely so modified that it could not be used beyond FY 2007,[13] and that other computer equipment obtained in FY 2007 and also expensed by TSI was not so modified. Indeed, Mr. Fletcher's testimony is completely lacking with respect to explaining what efforts TSI undertook to identify which computer expenses went to the heavily modified computers consumed in research and which computer expenses went to computers more routinely used by the company (*see* tr. 2/131-34).

### *Conference Costs*

The $304 that remains at issue in this appeal under Overhead and the $577 asserted under G&A represent claimed travel expenses that exceeded the maximum daily per diem rates (tr. 1/259). The COFD referred to the travel expenses being beyond the per diem rates in the "Joint Travel Regulations pursuant to FAR 31.205-46(a)(2)," (R4, tab 16 at 259), and the DCAA decrement memo also referenced the prices as exceeding the amounts permitted by the JTR and thus unallowable under FAR 31.205-46(a)(2) (R4, tab 4 at 57). The travel referenced was, it turns out, within the Continental United States (*see* tr. 2/134), to which the parties agree the JTR is not applicable, but the Federal Travel Regulation (FTR) is (*see* app. br. at 10; gov't br. at 58). There is no evidentiary dispute that TSI's travel costs exceeded the per diem set forth in the FTR by the same amount challenged by the ACO's COFD (*see* tr. 1/101; app. br. at 10).

### *Executive Bonuses*

Mr. Fletcher, TSI's CFO, testified that he created a bonus plan for himself, Mr. Benton, and Mr. Zysk sometime in late 2006 (tr. 2/189). He did so with the input of Mr. Benton, Mr. Zysk, and a former DCAA attorney (tr. 2/137), and it was

---

[13] It is worth noting here that TSI has given no explanation why such computers would constitute indirect costs, rather than costs that could be applied to identifiable contracts.

13

memorialized in a one-page document, signed by Mr. Benton and dated "1 Dec 06"[14] (R4, tab 9(c) at 129; tr. 2/138). The document provided that a "bonus pool," equating to 9% of the labor charges of these three executives would "be managed by consensus decision of the [three named executives]" (R4, tab 9(c) at 129). It also specified that the three executives would meet quarterly "to adjust bonus pools based on company performance metrics" (*id.*). The metrics were listed "to include" orders, sales, backlog, revenue, overhead rates, special accomplishments, and successful program management (*id.*). It did not specify how these metrics were to be measured or by what criteria the three executives would determine the appropriate amount of bonus to award (*id.*). Mr. Fletcher testified that the pool "[came] out of company profits. I mean, where else would it come from?" (Tr. 2/174) The one-page document outlining the bonus plan was apparently provided to the government for use in a provisional review of anticipated FY 2007 indirect costs, (tr. 2/146-51), but, as noted above, no government auditor ever performed such a provisional review of FY 2007 costs (tr. 1/31).

The record includes three memoranda written to justify bonus awards, which are dated 30 May 2007 (R4, tab 9(c) at 130); 14 September 2007 (*id.* at 131); and 27 February 2008 (*id.* at 132-33). The 30 May 2007 memorandum lists 5 bullet-point achievements for TSI and recommends $1,000 bonuses for each of the three executives. The 14 September 2007 memorandum listed 9 bullet-point achievements (repeating some of those in the 30 May 2007 memorandum) and recommended an award of "the bonus pool as it stands at the end of August 2007" to the 3 TSI executives (*id.* at 131). Finally, the 27 February 2008 memorandum, signed by Mr. Benton, included 11 bullet-point achievements (building upon those in the 14 September 2007 memorandum) and authorized distribution of the award pool, as it stood on 1 January 2008, to Mr. Zysk for $9,000 and Mr. Fletcher for $6,000 (*id.* at 133). TSI's internal timesheet reports reflect these payments as having been made the next day, on 28 February 2008 (*id.* at 134). Mr. Fletcher testified that, although the payment was made in 2008, the cost "accrued during the fiscal year 2007 because that was the year the expense was applicable to – that was the year that we did well and performed well" (tr. 2/140). None of the three memoranda in any way quantify the metrics with respect to how they determined the amount of the recommended bonuses (*see* R4, tab 9(c) at 131-34).

Mr. Fletcher testified that he met with DCAA auditor Marie Pepin for approximately two hours on 28 February 2008 to discuss the ICP for FY 2007 that would be submitted later in 2008, and raised the executive bonus plan with her during this discussion (tr. 2/121-22). According to Mr. Fletcher, Ms. Pepin said words to the

---

[14] Although the document may appear to be aspirational or to be promising a plan in the future in the sense that it states that TSI "will establish a process," (*see* R4, tab 9(c) at 129), the document is apparently the plan, itself (tr. 2/195).

14

effect of "this looks good to me," and then they moved on to other subjects (tr. 2/123). We find, as a matter of fact, that this discussion was relatively short and superficial in nature and did not constitute any representation that the government gave final approval to the bonus plan as proposed or executed.

*Legal Fees*

In 2002, the Naval Criminal Investigative Service (NCIS) began a criminal investigation of The Kemper Group, Inc. for overbilling, and later expanded the investigation to include TSI and Sonetech Corporation (Sonetech) (R4, tab 16 at 260; *see also* tr. 2/233). During this investigation, TSI was represented by the law firm of Preti Flaherty, LLC, which caused TSI to incur $34,429 in costs associated with the investigation from 2002 to 2005 (R4, tab 16 at 260, *see also* tab 53 at 1279-80). The investigation closed, with no decision to prosecute, in 2005, with NCIS sending a letter to Sonetech, advising it as much, but apparently not sending separate correspondence to TSI (*see* R4, tab 53 at 1278; tr. 2/234). On 20 June 2006, Sonetech faxed this NCIS correspondence to TSI (*id.*).

TSI was prohibited by FAR 31.205-47 from seeking payment for the costs of defending itself in the investigation until after it was concluded without a finding of criminal conduct. According to the COFD, this prohibition prevented TSI from submitting its legal costs contemporaneously with their being incurred,[15] but the reason that TSI gave the DCAA for submitting the costs in the FY 2007 ICP, instead of in 2006 (when it supposedly became aware of the fact that it was cleared of wrongdoing), was that it "forgot" (R4, tab 16 at 260). Mr. Fletcher (with whom DCAA was dealing and would have been the person who DCAA claimed stated that he "forgot" to include the legal fees in FY 2006) denies ever making such a statement to DCAA (tr. 2/212).

Through Mr. Benton's testimony, TSI alleged that it did not truly consider itself out of the woods, with respect to the investigation, until sometime in 2007 when NCIS returned documents to it (tr. 2/234-37). Based upon the testimony, we find it more probable than not that TSI was uncertain of the status of the investigation until 2007, which is the year for which it submitted its legal expenses.

*Consulting Fees of Charles Wilson*

Charles Wilson was a childhood friend of Mr. Benton's who signed a consulting agreement with TSI in 2005 (tr. 2/238-40; R4, tab 53 at 1026-27). The services specified in this two-page agreement were somewhat vague: Mr. Wilson was to provide

---

[15] Neither party argued that, subsequent to being cleared, TSI should have revised its 2002-2005 ICPs to include the legal costs as being incurred in those years.

compensated $100 per hour (R4, tab 53 at 1026-27). As Mr. Benton explained, he brought a business perspective to the company that Mr. Benton did not have the background to provide (tr. 2/238-40). Subsequent to the initiation of the DCAA audit of the FY 2007 ICP, TSI created a "Statement of Work" providing further detail of Mr. Wilson's duties, explaining his support to TSI (R4, tab 53 at 1039). The after-the-fact Statement of Work has little evidentiary value to us; nevertheless, despite their prior friendship, we are persuaded that Mr. Benton's retention of Mr. Wilson was legitimately intended to provide a business resource to the company.

In 2007, Mr. Wilson charged $2,925 to TSI for consulting fees (*see* R4, tab 53 at 1028, 1031, 1034, 1036). With these bills, Mr. Wilson specified the dates and hours that he spoke with TSI personnel or communicated with them via email, and included the general subjects about which they communicated (*see* R4, tab 53 at 1030, 1033, 1035, 1037-38). TSI has not provided any "work product" from Mr. Wilson, but did produce multiple emails on TSI business issues from 2007 to demonstrate that he was "in the loop" for company decisions (*id.* at 1040-86).

Upon review of the invoices from Mr. Wilson submitted by TSI and considering their level of detail and the email traffic indicating his inclusion of discussions of company affairs, we find there to be adequate substantiation of his work to support a finding that he performed the hours billed. We further determine that the rate of $100 per hour was not, on its face, unreasonable.

*Direct Travel Costs*

There is no factual dispute that the direct travel costs for contracts 0006, 0236, and 0340 exceeded the maximum allowable per diem rates by $1,074, $466, and $1,986, respectively (R4, tab 16 at 261-62; tr. 1/268).

*Subcontractor Costs*

The "Subcontracts" clause, included in all four contracts, generally requires that prime contractors that do not have an approved purchasing system must obtain the CO's written consent to enter into cost-reimbursement, time-and-materials or labor-hour subcontracts. FAR 52.244-2(d)(1) (1988, 1998). TSI did not have an approved purchasing system (which is not atypical for a contractor of its size (tr. 2/55, 65)) and, as a result, was required by the contract to obtain approval to enter into subcontracts from the CO (tr. 2/55). This, it did not do for the time-and-materials subcontracts questioned by the ACO (R4, tab 16 at 261-62, tab 6(a) at 79-80; tr. 1/130-31, 2/58). Mr. Fletcher testified on TSI's behalf that it generally did not seek pre-approval for its actions because it had found it difficult to contact the ACO (tr. 2/135-36).

16

After DCAA identified the subcontracts that had not received prior approval and recommended their complete disapproval, ACO Cuellar requested that it attempt a *post hoc* justification of their prices (tr. 1/250-51, 271). She allowed the cost for one of the questioned subcontracts because DCAA was able to perform an analysis that demonstrated the prices to be fair and reasonable (*id.*, tr. 1/269). For the others, however, DCAA and the ACO felt themselves unable to perform such a *post hoc* justification of the costs with the information provided (tr. 1/271-73). These costs were in the amount of $2,661 under contract 0236 (R4, tab 16 at 261) and $28,568 under contract 0340 (*id.* at 262).

In December 2008, after it became clear that approval of subcontracting costs would be an issue in the audit, Mr. Benton reached out to DCMA ACO, then, Ms. Sandee Murray, and requested retroactive approval of some the subcontract awards (R4, tab 6(f)). There was no apparent government response to this letter, and, in 2014, Mr. Benton reached out to a number of people seeking support for the subcontract costs. The record includes emails from Mr. Timothy Devin, Mr. Adam Cascioli (project officer for contract 0340), and Mr. Brian Almquist (the contracting officer's technical representative (COTR)) (app. supp. R4, tab 156, at 3-4, tab 157 at 1-2). All of these email correspondences indicate that the subcontracts "were in support of the [statement of work]" (*e.g.*, app. supp. R4, tab 157 at 1), but none of them venture to provide an opinion regarding the reasonableness of the prices charged (*see* tr. 2/51-52). We have no reason to doubt that the subcontract prices were allocable to the contract, and so find here, but there is no evidence elsewhere in the record with respect to the reasonableness of the subcontract charges, except the earlier statement that the ACO was able to independently confirm the reasonableness of the cost of one subcontract (tr. 1/269).

## DECISION

TSI advances ten arguments, or "claims" in its appeal (*see* app. br.) and, at Judge Clarke's invitation (*see* Bd. corr. ltr. dtd. 21 March 2016), modified its first argument (which had previously been more directly related to the statute of limitations (*see* app. br. at 2-3)) to transform it into an argument regarding "course of dealings" in its reply brief (*see* app. reply br. at 1, 3-12). We will address and reject the "course of dealings" argument, along with Judge Clarke's related theory about the doctrine of "retroactive disallowance," first, then turn to the other general argument regarding the statute of limitations, which we also reject. We will then address the remaining arguments TSI raises against portions of the COFD and decide them upon their individual merits. We need not address the argument of auditor independence because TSI has conceded it (app. br. at 3).

17

I.   The Doctrines of Retroactive Disallowance and Past Performance Do Not Preclude the Questioning of Costs in this Appeal

TSI argues that DCAA's prior "accept[ance of its] legal and consulting services costs, along with [its] depreciation methods...prior to 2007," constituted a prior course of dealing that would preclude their being questioned by the government in the FY 2007 audit (app. reply br. at 5-6). Judge Clarke's dissent revises the approach he took in his letter to the parties in which he requested them to brief the course of dealings theory because he is now of the opinion that the doctrine of retroactive disallowance more directly precludes the government from challenging costs allowed in prior years, although course of dealings remains his fallback position. Retroactive disallowance was not briefed by the parties, but we need not seek further briefing upon it because we find the law to have changed to make it an unsustainable theory here and that it is inapplicable to the facts of this appeal in any event.

Retroactive disallowance is a theory for challenging audits whose heyday has come and gone. The theory was first set forth by the Court of Claims in *Litton Systems, Inc. v. United States*, 449 F.2d 392 (Ct. Cl. 1971). We elaborated upon it, as Judge Clarke's dissent notes, in such cases as *Gould Defense Systems, Inc.*, ASBCA No. 24881, 83-2 BCA ¶ 16,676; and *Data-Design Laboratories*, ASBCA No. 21029, 81-2 BCA ¶ 15,190. In these cases, we characterized the principle as preventing the government from challenging costs already incurred when:

> [T]he cost or accounting method in question previously
> had been accepted following final audit of historical costs;
> the contractor reasonably believed that it would continue to
> be approved; and it detrimentally relied on the prior
> acceptance.

*Gould*, 83-2 BCA ¶ 16,676 at 82,981 (citing *Data-Design*, 81-2 BCA ¶ 15,190). The last appeal in which we granted relief based upon retroactive disallowance was our 2002 decision of *Lockheed Martin Western Development Laboratories*, ASBCA No. 51452, 02-1 BCA ¶ 31,803. Prior to *Lockheed Martin*, retroactive disallowance was last used to grant relief in the 1986 case of *Data-Design Laboratories*, ASBCA No. 27245, 86-2 BCA ¶ 18,830.

In 1984, however, the seeds of the doctrine's diminution were sown by the Supreme Court in the case of *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984), which explicitly recognized that, "the Government may not be estopped on the same terms as any other litigant." 467 U.S. at 60. The United States Court of Appeals for the Federal Circuit (the Federal Circuit) subsequently held that "affirmative misconduct [has been recognized] as an element of

18

an estoppel claim against the government." *Henry v. United States*, 870 F.2d 634, 637 (Fed. Cir. 1989) (citations omitted); *see also Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000) ("While the Supreme Court has not squarely held that affirmative misconduct is a prerequisite for invoking equitable estoppel against the government, this court has done so.") (citations omitted). Being a "special application of estoppel principles," *see Gould*, 83-2 BCA ¶ 16,676 at 82,981, retroactive disallowance is thus now subject to the same affirmative misconduct requirement as other estoppel defenses. This sea-change was clearly recognized by the Federal Circuit in a case cited in Judge Clarke's dissent, *Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361 (Fed. Cir. 2003).

In *United Technologies*, which was an appeal of one of our decisions, the Federal Circuit characterized the retroactive disallowance argument (an argument that United Technologies had advanced at the trial level, but had been unnecessary for us to reach[16]) as being that the "government [was] estopped from contesting" the accounting determination at issue. 315 F.3d at 1377. Relying upon *Zacharin*, the Federal Circuit instructed us that "affirmative misconduct" on the part of the government would be required for the application of the principle. *Id.* at 1377 (citing *Zacharin*, 213 F.3d at 1371). On remand, we quickly dispensed with appellant's argument that the Federal Circuit had been unfamiliar with the *Litton* line of cases, and made clear that our understanding of the Federal Circuit's opinion was that retroactive disallowance is a species of estoppel and, thus, the affirmative misconduct requirement applies to it. *United Technologies Corp., Pratt & Whitney*, ASBCA No. 47416 *et al.*, 06-1 BCA ¶ 33,289 at 165,055-58.

Little has happened with regard to retroactive disallowance since the decision on remand of *United Technologies*, in no small part, we believe, because affirmative misconduct is a difficult bar to clear. Nevertheless, as Judge Clarke notes, the defense was raised briefly last year when we denied a motion for summary judgment in the appeal of *Raytheon Company*, ASBCA No. 57576 *et al.*, 15 BCA ¶ 36,043 at 176,055, finding retroactive disallowance to be unsupported by the undisputed facts. While it is

---

[16] To be sure, as Judge Clarke notes in his dissent, we did not explicitly call it "retroactive disallowance" in our initial opinion, *see United Technologies Corp., Pratt & Whitney*, ASBCA No. 47416 *et al.*, 01-2 BCA ¶ 31,592 at 156,133, but, inasmuch as appellant was clearly relying upon the *Litton* line of cases in its arguments to the Federal Circuit, *see United Technologies*, 06-1 BCA ¶ 33,289 at 165,033-34, and, acting upon the remand, we read the Federal Circuit's opinion to plainly apply to United Technologies' retroactive disallowance argument, *id.* at 165,056-58, we find the argument's label to be irrelevant. It was simply a rose by another name – another name that, not coincidentally, underscored that retroactive disallowance had always been premised upon estoppel.

19

true that we did not discuss the requirement of affirmative misconduct in *Raytheon*, that omission is far too slender a reed to support a view of the law that leaves out this critical element: in our offhand discussion of retroactive disallowance (in which we ruled in favor of the government), we did not purport to overrule our precedent in *United Technologies* nor the Federal Circuit's dictates in the same case. To sum up: there is no way to read our recent precedent or the Federal Circuit's except to include an affirmative misconduct requirement amongst the elements of retroactive disallowance. Period.

Thus, turning to the facts of this case, we readily dispose of the application of retroactive disallowance to it. Judge Clarke does not assert that there is a factual predicate for finding affirmative misconduct on the part of the government in this matter. Without that element, there is no retroactive disallowance. *United Technologies*, 06-1 BCA ¶ 33,289 at 165,055-58. Moreover, even without such a requirement, we would still find, on the facts before us, that retroactive disallowance is inapplicable to this appeal. The government's failure to challenge TSI's costs in prior audits (without more) was not enough to give TSI the reasonable belief that such costs would never be challenged in the future.[17] This would be the case even if we were not to read the law (as we do) to require an unequivocal statement by the government that the costs were considered to be supported. *See Gould*, 83-2 BCA ¶ 16,676 at 82,981 (holding the doctrine applicable when the government "unequivocally accepts a contractor's proposed accounting treatment"). When we consider retroactive disallowance to include a requirement that the government make an unequivocal statement regarding the allowability, the case for applying this defense is even more plainly deficient here.

TSI fares no better under the prior course of dealing theory. The notion, as explained by Judge Clarke, is that the interpretation of FAR part 31 by prior auditors, "set a standard TSI was entitled to rely upon." TSI makes a similar argument, although it combines retroactive disallowance with course of dealing in a somewhat confusing way (app. reply br. at 3-12). These arguments founder for the simple reason that DCAA's inaction or failure to challenge a cost in prior audits as was the case here does not "set" any "standard," nor establish the "common basis for understanding" that is necessary for TSI to prevail under this contractual theory.

Our law regarding course of dealing relies upon the standards set forth in the Second Restatement of Contracts. *See, e.g., BAE Systems Technology Solutions & Services, Inc.*, ASBCA No. 57581, 13 BCA ¶ 35,414 at 173,741-42; *T&M Distributors, Inc.*, ASBCA No. 51405, 00-1 BCA ¶ 30,677 at 151,509. The binding law in our Circuit hews to the Restatement as well. *See Sperry Flight Systems v. United States*, 548 F.2d 915, 922-23 (Ct. Cl. 1977). The Restatement, itself, provides that:

---

[17] Even TSI's CFO, Mr. Fletcher, acknowledged that a different auditor could interpret risk differently and thus examine different matters than prior auditors (tr. 2/175).

§ 223 Course of Dealing

> (1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
>
> (2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.

RESTATEMENT (SECOND) OF CONTRACTS § 223 (1981). For our purposes, the key language from Section 223(1) of the Restatement is that a course of dealing is "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." The Court of Claims elaborated upon this language in *Sperry Flight Systems,* to state that "a course of dealing can supply an enforceable term to a contract...provided that the conduct which identifies that course of dealing can reasonably be construed as indicative of the parties' intentions – a reflection of their joint or common understanding." 548 F.2d at 923.

DCAA's failure to question certain costs in prior audits, without more, does not "establish[] a common basis of understanding," *see* RESTATEMENT § 223(1), of what should constitute adequate substantiation of (or support for) TSI's incurred costs. This is the case because, under the circumstances presented here, the failure to question certain costs could mean more than one thing: it could just as easily mean that the government is satisfied with the proof offered by TSI as it could mean that the auditor chose to more carefully investigate certain issues (for any of a variety of legitimate reasons) in some years than in other years.[18] Thus, without more information, a contractor could only speculate as to why the government chose not to question costs.[19] And, when there is only speculation as to the meaning of an auditor's silence, such silence cannot "reasonably be construed as indicative of the parties' intentions [or] their joint and common understanding." *Sperry Flight Systems,* 548 F.2d at 923.

---

[18] Indeed, the evidence is clear that in some years prior to the FY 2007 ICP audit, the government did question costs incurred by TSI that it did not in other years.

[19] This is not to say that in no circumstances could an auditor's course of conduct establish evidentiary standards for substantiation. For example, in the case of a contractor that was specifically told that certain receipts were considered to be adequate substantiation of costs by the government and that it should not bother to preserve more evidence, the result might be different. We are not presented with that case here.

Judge Clarke's dissent cites two cases for the proposition that a prior course of dealing can be relevant to the allowability of costs: *Blue Cross Association and Blue Shield Association*, ASBCA No. 25778, 89-2 BCA ¶ 21,840 at 109,907 n.41; and *Ford Aerospace and Communications Corp., Aeronutronic Division*, ASBCA No. 23833, 83-2 BCA ¶ 16,813 at 83,631 n.3. The general point is correct, but neither case presented circumstances remotely like those here, where the government's failure to raise a matter during an audit was contrived to constitute a course of dealing making all unquestioned costs allowable.

We note finally that, as tempting as it might be to grant relief to TSI – for it does appear to be a sympathetic actor – such a course would lead to a number of unanticipated and undesirable consequences. Notably, a rule that would grant TSI relief here would encourage DCAA and COs to question as many costs as possible in early audits so as to "speak now or forever hold its peace." It is far better, we think, to encourage auditors to exercise judgment and discretion in determining the scope of their audits. In *Sperry Flight Systems*, the Court of Claims noted similar concerns about too readily applying a course of conduct to preclude government action, stating that, "what plaintiff argues for is a contract right that would undermine the authority and responsibility vested in a contracting officer.... [N]othing has been shown here that would justify placing the Government in so irretrievable a position." 548 F.2d at 923. Such is the case here.

## II.   TSI's Statute of Limitations Arguments are Unavailing

TSI concedes that its original contention that the entire COFD was time-barred "does not stand" (app. br. at 2), but alleges three questioned cost matters to which it argues the statute does apply (*id.* at 2, 5, 11). TSI is incorrect in all three particulars.

Under the CDA, the government must present any claim against the contractor within six years of its accrual. 41 U.S.C. § 7103(a)(4)(A); *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1320 (Fed. Cir. 2014); *Kellogg Brown & Root Services, Inc.*, ASBCA No. 58175, 15 BCA ¶ 35,988 at 175,823 (*KBR*). The definition of "accrual" comes from the FAR, and is "the date when all events, that fix the alleged liability of...the contractor and permit assertion of the claim, were known or should have been known.... [M]onetary damages need not have been incurred." *Sikorsky*, 773 F.3d at 1320 (quoting 48 C.F.R. § 33.201); *see also KBR*, 15 BCA ¶ 35,988 at 175,823-24. Inasmuch as *Sikorsky* established that that CDA statute of limitations is an affirmative defense, not a matter of jurisdiction, *see* 773 F.3d at 1322, the burden of proof is on TSI to prove that it was not met. *KBR*, 15 BCA ¶ 35,988 at 175,823.

As a general proposition, the costs questioned by ACO Cuellar's COFD were those set forth in TSI's FY 2007 ICP, which was submitted to the government on 30 June 2008. Even if the mere submission of the ICP started the six-year statute of limitations clock (before the subsequent audit produced evidence that the costs were unsupportable) the statute would not have run until 30 June 2014. Since the COFD that constituted the government claim here was filed on 23 June 2014, it was within the statutory time period. We further note that it was legally impossible for the government to issue its COFD before the submission of the ICP, because the legal bases for the government's unilaterally establishing the indirect costs, FAR 42.705-1 and FAR 42.302(a)(9) (*see* R4, tab 16 at 256), presupposed action upon a "final" ICP submitted by the contractor. *See* FAR 42.705-1(b). Since no COFD approving or disapproving portions of the FY 2007 ICP could have been issued until after the submission of said proposal by TSI, and the ability to assert such a government claim is a prerequisite to claim accrual, *Sikorsky*, 773 F.3d at 1320 (quoting 48 C.F.R. § 33.201); *see also KBR*, 15 BCA ¶ 35,988 at 175,823-24, it is impossible for the statute to have begun to run here prior to the submission of TSI's FY 2007 ICP.

TSI's argument, on pages 2 and 3 of its brief, regarding use of prior years' audits to influence future audits is unclear and, to the extent it is an argument about the statute of limitations, is unpersuasive. The costs questioned for FY 2007 could not have been questioned until they were submitted, and, whatever decisions the ACO made with respect to other years did not give her the ability to question costs before they were formally submitted to her.

TSI further argues that its marketing costs with SMI were much the same in 2007 as in prior years, thus, the submittal of TSI's FY 2006 ICP should have tipped the government off that there was a problem with these costs (if, indeed, there were such a problem) more than six years prior to the COFD here (app. br. at 5-6). This argument is unpersuasive and is more in line with the retroactive disallowance and course of dealings positions expressed by Judge Clarke than a straightforward statute of limitations argument. Again, it would not have been possible for the ACO to question the actual costs submitted and to issue a decision constituting a claim until TSI submitted its FY 2007 ICP as noted above. At most, the prior years' information *might* be argued to have bearing upon when the government knew or should have known that the 2007 costs, as submitted in the FY 2007 ICP, were dubious, but this prior years' information would only be material subsequent to the FY 2007 ICP submittal.

TSI's final particular statute of limitations argument is that the government knew the particulars of its executive bonus plan in early 2007, more than six years before the issuance of the COFD, so it should not have been able to question it more than six years later (app. br. at 11). Again, the pitfall in this argument, with respect to

23

the statute of limitations,[20] is that, whatever knowledge the government may have had with TSI's aspirational plans (and they were labelled as such), it could not have asserted a government claim until after TSI submitted its FY 2007 ICP.

TSI has made no further allegations regarding the statute of limitations, thus, this affirmative defense poses no barrier to any of the government's other claims here.

## III. TSI is Entitled to Some Relief upon the Merits

As noted in the Findings of Fact section, above, the contractual provision governing the primary dispute in this matter requires payment of a contractor's indirect costs if the costs are allowable under the contract (which is controlled by the FAR) and if they are "shown in the records maintained by the contractor." FAR 52.216-7(b)(1)(F). As will be shown herein, some FAR provisions regarding allowable costs include sections setting forth the type of proof necessary to support the cost. *See, e.g.,* FAR 31.205-33(f)(2) and (3). The government has the burden of proof for demonstrating that a cost is unallowable. *Johnson Controls World Services, Inc.,* ASBCA Nos. 46674, 47296, 96-2 BCA ¶ 28,464 at 142,166 (citations omitted). With these general principles in mind, we turn to the cost elements that remain disputed.

### A. TSI is Entitled to Payment for SMI's Marketing Costs

The government labors under the false impression that the FAR requires a consultant to create "work product" merely for the purposes of proving its costs (*see* R4, tab 16 at 258, 260; gov't br. at 54-55, 64-66). Though the FAR language in question is not as clear as we might like, it can be read – as we read it here – to impose no such requirement, Moreover, we have factually found the invoices submitted by TSI to be adequate to support a finding that TSI incurred the charged costs for SMI's marketing activities.

We begin by examining that language of the FAR that the government holds out as requiring the generation and provision of "work product" to entitle recovery of costs for professional and consultant services. FAR 31.205-33, Professional and consultant service costs, provides in relevant part that:

> (f) Fees for services rendered are allowable only when supported by evidence of the nature and scope of the service provided.... Evidence necessary to determine that

---

[20] TSI did not argue that its submission of its executive bonus plan to the government in early 2007 should support invocation of the principles of retroactive disallowance or course of dealing. Even if it had, they would be inapplicable as we find factually that there was neither government misconduct nor unequivocal acceptance of this plan.

24

work performed is proper and does not violate law or regulation shall include –

(1) Details of all agreements (*e.g.*, work requirements, rate of compensation, and nature and amount of other expenses, if any) with the individuals or organizations providing the services and details of actual services performed;

(2) Invoices or billings submitted by consultants, including sufficient detail as to the time expended and nature of the actual services provided; and

(3) Consultants' work products and related documents, such as trip reports indicating persons visited and subjects discussed, minutes of meetings, and collateral memoranda and reports.

The government makes a superficially persuasive argument, that the FAR's statement that the evidence necessary to determine that the work is proper "shall include...work products" and related documents, makes the provision of such documents mandatory (gov't br. at 54). The problem with this interpretation of the FAR is that it does not account for the case in which such documents were never created by the consultant. Moreover, it does not account for the case where, as here, the invoices include the data that the FAR defines as work product, such as persons visited and subjects discussed. We further note, that DCAA's own audit manual, reflecting the government's own interpretation of this FAR requirement, provides that, "[t]he auditor should not insist on a work product if other evidence provided is sufficient to determine the nature and scope of the actual work performed." DCAA Manual, at 58-2 – 58-3. Moreover, amongst the "Frequently Asked Questions" in the relevant portions of the audit manual are responses indicating that other additional evidence may be considered to determine whether the services were, indeed, provided and allowable. *Id.* at 58-7.

Thus, we conclude that FAR 31.205-33(f) may require the provision of a consultant's work product, if it exists, but is not so rigid as to require its creation when it would not otherwise be necessary for the consultant to perform its duties. To be sure, any lack of work product makes it more difficult for a contractor to prove that it incurred the costs for which it seeks compensation, and the lack of work product in an instance where the consulting work was of such a scale or scope that work product would be expected may properly subject the costs to question. As with most things, the proper amount of documentation and work product to be expected will largely depend on the scope of work performed, and we do not conclude that the FAR

25

intended to impose "make work" upon consultants that would only lead to higher costs to the contractor which would then be imposed upon the taxpayer.

Turning to the facts before us, we have found that the consulting agreements and the invoices provided, combined with the testimony given at the hearing, persuade us that the costs included in TSI's FY 2007 ICP for SMI's marketing services were, in fact, for that purpose and are allowable. This portion of the appeal is sustained.

### B. TSI's Full Expensing of Computers was Properly Rejected by the ACO

The use of depreciation as an indirect cost in the contracts here is governed by FAR 31.205-11(c), which provides:

> [A]llowable depreciation shall not exceed the amount used for financial accounting purposes, and shall be determined in a manner consistent with the depreciation policies and procedures followed in the same segment on non-Government business.

TSI had no written depreciation policy in 2007 or in years prior to 2007, but its prior practice was to depreciate computers and computer equipment over a period of years. In 2007, that changed when, in line with its IRS filings, it completely expensed the computers and computer equipment it purchased.

We view TSI's depreciation practices in its FY 2007 ICP as inconsistent with its prior long-term practices. We also find its rationales for the new approach to be unpersuasive: being a "cutting edge" technology company does not appreciably change the useful lives of desktop computers used for office work; the fact that *some* computers were modified for non-office work does not affect the depreciation of those that were not – and TSI has not demonstrated what portion of the computers expensed actually were so modified; and the IRS Code's allowance for earlier write-offs, for tax purposes, of full depreciation in a year, does not have any effect on the proper depreciation for our purposes. Accordingly, the government prevails in this portion of the appeal. Computers and computer equipment not allocable as direct costs are to be depreciated at the same rate as in prior years.

### C. TSI's Travel Costs were Properly Challenged

TSI has provided no good reason to depart from the decision of the government to challenge the travel costs that exceeded the proper per diem rates. There is no dispute that the costs challenged by the government exceeded those rates, nor that this forms a basis for disallowing the excess costs pursuant to FAR 31.205-45(a)(2). Nevertheless, TSI propounds two arguments for why this should not matter: first, TSI

26

argues that the CO wrongly identified the applicable travel regulation (app. br. at 9-10). The COFD references the JTR, which applies to travel outside of the Continental United States, instead of the FTR, which was truly applicable since all of the challenged travel was within the Continental United States (*id.*). Next, TSI argues that its general travel policy saved the government money (*id.* at 10). Neither argument is persuasive.

Although the COFD did err, as both parties concur (*see* gov't br. 58) in naming the JTR as the applicable regulation, rather than the FTR, this is a defect of form, rather than substance because FAR 31.205-45(a)(2) applies to when the per diem rates of either the JTR or the FTR were exceeded, and the applicable per diem rates were, in fact, exceeded here. Because we review the COFD *de novo*, *see Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994); *Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed. Cir. 1987), we may sustain the ACO's decision even if it is articulated with less precision than all would like. Here, we conclude that the ACO was correct to question the per diem payment for being contrary to regulation.

TSI's allegation that its travel policies saved the government money is undeveloped and would not excuse it from compliance with travel regulation limits on per diem in any event. While there are exceptions to the strictures of FAR 31.205-45(a)(2), contained in subsection (a)(3) of the FAR provision, TSI has not attempted to apply these exceptions in its argument (*see* app. br. at 10), and we can identify at least one – a requirement that a written justification for use of higher rates be made by an appropriate authority in the company, *see* FAR 31.205-45(a)(3)(ii) – that TSI did not meet.

### D. TSI is not Entitled to Payment for its Executive Bonuses

We agree with the government that TSI's executive bonus plan was too amorphous in its criteria for bonus award and subject to too unfettered discretion in its application to permit the inclusion of its costs in the ICP. As will be demonstrated below, when an executive bonus plan lacks measurable metrics and is essentially subject to the unfettered discretion of those who would benefit from it, as did TSI's, its costs are not compensable.

We start with the governing FAR provision, FAR 31.205-6(f), *Bonuses and incentive compensation*, which provides in relevant part:

> (1) Bonuses and incentive compensation are allowable provided the –
>
> (i) Awards are paid or accrued under an agreement entered into in good faith between the contractor and the employees before the services are rendered or pursuant to an established plan or policy followed by the contractor so

27

consistently as to imply, in effect, an agreement to make such payment; and

(ii) Basis for the award is supported.

Thus, a bonus award must be made pursuant to an agreement or well-established plan or policy, and there must be support for the basis of the award. An underlying feature of the jurisprudence applying this FAR provision is an intent to avoid a company's "in-group" using the bonus pool as a means of distributing company profits amongst themselves. In *Nolan Brothers, Inc. v. United States*, 437 F.2d 1371 (Ct. Cl. 1971), the Court of Claims noted that payment of bonuses from a family-owned corporation to officers who were members of the family "justified close scrutiny" to ensure that the bonuses were not a disguised "distribution of the corporation's earnings." 437 F.2d at 1384. And in *Northlich, Stolley, Inc. v. United States*, 368 F.2d 272 (Ct. Cl. 1966), a tax case cited by the court in *Nolan Brothers*, the Court of Claims expressed similar concerns when the officers to whom the compensation was paid were "in complete control of the corporation's affairs." 368 F.2d at 278.

Our prior cases have similarly expressed discomfort with, and rejected, bonus plans that give too much leeway in making bonus awards to those who would benefit from them. In *SplashNote Systems, Inc.*, ASBCA No. 57403, 12-1 BCA ¶ 34,899, we disallowed the use of a bonus plan because its "lack of specificity, constraints, or parameters contribute[d] to the conclusion that [the] bonus was a distribution of profit." *Id.* at 171,610. We noted in *Boeing Aerospace Operations, Inc.*, ASBCA Nos. 46274, 46275, 94-2 BCA ¶ 26,802, that we "would not endorse 'a policy which would permit payments to be made or not made in the unlimited discretion of management or...the kind of policy that was not consistently or clearly defined.'" *Id.* at 133,285 (quoting *General Electric Co.*, ASBCA No. 28753, 89-1 BCA ¶ 21,445 at 108,056[21]). This is consistent with the notion that, in order to be able to judge whether there is a supported basis for a bonus award, *see* FAR 31.205-6(f)(1)(ii), there must be some clearly defined criteria for making the award in the first instance.

Thus, we turn to TSI's bonus plan. The government contends that there was no such plan because there was no written agreement between TSI and the three bonus recipients at any time during FY 2007 (gov't br. at 59). To be sure, the December 2006 memorandum signed by Mr. Benton promising the establishment of such a plan is a shaky foundation for TSI to rely upon for proof of an agreement, though the testimony surrounding it might be sufficient for us to conclude, in this case, that it did constitute such an agreement. We need not decide that matter, however, because we conclude that

---

[21] In this quotation contained in our *Boeing* decision, we inadvertently cited to a differently named case (though the citation was to the correct page of the reporter). The citation here has been corrected to reflect the proper case name.

TSI's "bonus plan" was fatally defective in that the one-page memorandum purporting to establish it was utterly lacking in clearly defined criteria for making bonus decisions and effectively left decision-making regarding the award of any bonuses to the unfettered discretion of the very same three individuals who were to be the recipients of the bonuses.[22] The arbitrary nature of the bonus awards is reflected in the memoranda supporting them, which referenced generalized achievements without tying them in any way to the amount of the bonuses awarded. Thus, because TSI's bonus policy lacked specificity and constraints, see SplashNote Systems, 12-1 BCA ¶ 34,899 at 171,610, and effectively provided "unlimited discretion" to management, see Boeing Aerospace Operations, 94-2 BCA ¶ 26,802 at 133,285, we hold that it is not a compensable cost. This determination is buttressed by evidence that Mr. Fletcher considered the bonus pool to effectively come from company profits and the fact its distribution came at the whim of TSI's "in" group, justifying "close scrutiny," Nolan Brothers, 437 F.2d at 1834, which it simply cannot withstand.[23]

## E. TSI is Entitled to a Significant Portion of its Legal Fees

TSI does not dispute some of the legal fees challenged by the government, but seeks inclusion of the allowable portion (80%) of the $39,060 it incurred defending itself in the NCIS investigation, $31,248 (app. br. at 13). For its part, the government does not dispute the fact that the legal fees for the investigation, as subjected to the 20% discount, would otherwise be allowable (see gov't br. at 62, 64), but argues that the fees were expensed to the wrong year (id. at 62-63). We disagree with the government.

Although it would have been easiest if TSI had been able to have sought the legal costs contemporaneously with their incurrence, it was precluded from doing so by FAR 31.205-47(g), which generally precludes the CO's paying such fees while the investigation is pending. The government asserts that, once NCIS notified Sonetech that the investigation was complete and that company told TSI, TSI was obligated to immediately claim the costs (gov't br. at 62). But, as we found above, in the factual circumstances presented here, it was reasonable for TSI to wait until it received its documents back from the NCIS in 2007 to be certain that the investigation was complete and no longer pending. Accordingly, we find TSI to have acted appropriately in seeking its legal costs in the FY 2007 ICP, and rule that it was entitled to claim them (as discounted).

---

[22] In this holding, we respectfully part ways with Judge Clarke. Although he found adequate support for the awards and is of the general view that the small size of the company decreases the need for formality, we, nevertheless, cannot find support in the law for permitting a bonus plan with the kind of unfettered discretion that we encountered here.

[23] Because we find the bonus plan impermissible, we need not determine whether the March 2008 payment was properly allocable to the FY 2007 ICP.

29

F. TSI is Entitled to Payment for Mr. Wilson's Consulting Costs

As we discussed at length in Section A above, the supposed requirement for "work product" is not fatal to a contractor's seeking compensation for consultant's work in the proper circumstances. In our Findings of Fact, above, we determined that Mr. Wilson's hours were substantiated and not unreasonable. Accordingly, we hold that the government's determination that TSI was not entitled to compensation for Mr. Wilson's costs in its FY 2007 ICP was incorrect.

G. The Government Correctly Determined that the Costs of Two TSI Subcontractors were Unallowable

It is undisputed that the direct costs of the two subcontracts challenged by the ACO and remaining at issue were, contrary to the terms of the FAR (as incorporated into TSI's contracts), not pre-approved by the ACO. TSI attempts to evade that problem by alleging that, because the subcontracts were technical in nature, the ACO would have needed to consult with the COTR to decide if they were proper, and further alleging that the COTR has performed an after-the-fact review and found the subcontracts to have been performed in support of the statement of work (app. br. at 16-17).

As we expressed in our Findings of Fact, we entertain little doubt that the subcontracts were performed pursuant to the statements of work of the contracts and were thus allocable costs. The problem for TSI – a problem that it does not address – is that the support letter it received from the COTR stakes out no position on the reasonableness of the costs of the subcontractors. This omission is fatal to TSI's attempts to provide an after-the-fact justification of these subcontracts. *See* FAR 52.244-2(e)(1)(vii) (requiring contractor's provision of information for determination of price reasonableness). Thus, the government properly disallowed the $2,661 in challenged subcontract costs under contract 0236 and the $28,568 in challenged subcontract costs under contract 0340.

30

## CONCLUSION

As discussed herein, neither the principles of retroactive disallowance and course of dealing, nor the statute of limitations prevent us from reaching the merits of the government's decision to challenge certain of the costs contained in TSI's FY 2007 ICP. TSI's costs for SMI and Charles Wilson were allowable as were $31,248 in legal fees. The remainder of the disallowances in the COFD were proper.

We return this matter to the parties to recalculate the rates in accordance with this decision.

Dated: 12 January 2017

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

ALEXANDER YOUNGER
Administrative Judge
armed Services Board
of Contract Appeals

I concur in relief given and otherwise dissent (see separate opinion)

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

31

## DISSENTING OPINION BY ADMINISTRATIVE JUDGE CLARKE

I respectfully dissent. While I concur with the relief granted by the majority, I disagree with the reasoning. DCMA and DCAA engaged in retroactive disallowance and created an audit course of dealing that this small hi-tech business relied upon to its detriment. The majority's reasoning fails to hold DCMA and DCAA accountable. I was the trial judge and therefore drafted the initial version of the decision that my colleagues choose not to adopt. Therefore, to ensure my thinking is fully understood, I present my decision as my dissent.

This is an appeal by Technology Systems, Inc. of a DCMA final decision reducing its final indirect rates for FY 2007 and demanding the return of $159,303. Appellant's owner presented its case *pro se*. The Board has jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. The appeal should be sustained in part as put forth in my dissent.

## FINDINGS OF FACT

1. Technology Systems, Inc. (TSI) is a small technology business conducting research and development of software systems relating to new ways for ship navigation (tr. 2/227). TSI employs approximately 20 people[1] (tr. 2/193), including three executives: Mr. Benton, chief technology officer, president & sole owner (tr. 2/229-30), Mr. Fletcher, chief financial officer (CFO) (tr. 2/117), and Mr. Zysk, chief operating officer (COO) (tr. 2/73, 76, 102). Mr. Benton started TSI in 1985 and from 1987 on it was a defense contractor. TSI ceased operations in August 2014.[2] (Tr. 2/230)

2. During the time relevant to the FY 2007 DCAA audit, TSI had four cost-plus-fixed-fee (CPFF) contracts for research and development with the Navy: Contract Nos. N00039-07-C-0006 (0006), N00014-07-C-0236 (0236), N00014-07-C-0340 (0340), and N41756-05-C-4775 (4775)[3] (R4, tabs 1-3, 16 at 268, tab 17 at 269).

3. Contracts 0006, 0236 and 0340 contained the following clauses: FAR 52.215-2, AUDIT AND RECORDS – NEGOTIATION (JUN 1999); FAR 52.216-7, ALLOWABLE COST AND PAYMENT (DEC 2002); FAR 52.233-1, DISPUTES (JUL 2002); FAR 52.242-1, NOTICE OF INTENT TO DISALLOW COSTS (APR 1984); FAR 52.242-3,

---

[1] In early 2008 TSI had only 15 employees (R4, tab 151 at 2).

[2] Mr. Benton testified that TSI "still exists on paper so that it can interact in the way that we're doing today" (tr. 2/230).

[3] Contract 4775 was identified as a classified contract and a copy is not in the record (R4, tab 53 at 910).

PENALTIES FOR UNALLOWABLE COSTS (MAY 2001); and FAR 52.244-2, SUBCONTRACTS (AUG 1988), (contract 0006) or 1998 (contracts 0236, 0340) (R4, tabs 1-3). I infer that contract 4775 also had these required clauses.

4. The Subcontracts' clauses generally require that prime contractors that do not have an approved purchasing system must obtain the contracting officer's written consent to enter into cost-reimbursement, time-and-materials or labor-hour subcontracts. FAR 52.244-2(d)(1). TSI did not have an approved purchasing system[4] and as a result had to obtain approval to enter into subcontracts (tr. 2/55).

*DCAA/DCMA Audit History before FY 2007*

·5. There is no dispute over TSI's audit history prior to the FY 2007 audit. Ms. Winefield, DCAA supervisory auditor, testified that DCAA conducted full audits of TSI's Incurred Cost Proposals (ICPs) for FYs 1998 to 2003 and 2006. DCAA conducted a "desk review" for FYs 2004 and 2005. The desk review for FY 2005 included the statement, "We determined that no significant costs were questioned in prior years and that no indicators of audit risk had been identified" (app. supp. R4, tab 100 at 2904). A desk review could be conducted if, after review of TSI's ICP, DCAA determined that there was a low risk that the ICP contained unallowable costs. A desk review is not a full audit. Desk reviews can only be conducted two years in a row. (Tr. 1/16-17, 26-28) As for the results of the audits, the record does not contain information on audit results before 2001. The FY 2001 audit questioned several costs but "it primarily questioned $70,072 in the Professional Fees Cost Element claimed in overhead and in G&A" for Messrs. Kemper, Ring and Wilson. These costs were questioned, because, among other reasons, TSI failed to provide evidence supporting the work performed by the consultants. (Ex. G-1 at 4-5, 9-11) The FY 2001 audit resulted in negotiations between the ACO and TSI and a rate agreement was achieved (tr. 2/256). For FYs 2002 to 2006, DCAA/DCMA did not question costs and accepted TSI's indirect rates without change (tr. 2/60-63; R4, tab 6(a) at 72, tab 70 at 1554). The FY 2006 audit was a full audit (tr. 2/174). FY 2006 included, "In our opinion, the contractor's indirect rates are acceptable as proposed" (app. supp. R4, tab 101 at 6105).

*The FY 2007 Audit*

6. TSI's FY 2007 ICP was submitted on or about 25 June 2008 (R4, tab 15 at 227). DCAA's incurred cost audit of TSI's 2007 ICP started in the fall of 2008 (tr. 1/36). Ms. Waller and Ms. Pitts were the DCAA auditors conducting the audit

---

[4] Administrative contracting officer (ACO) Cuellar testified that "a contractor such as TSI typically does not have an approved purchasing system because they don't meet the requirements, you know, where we would do a review in most cases, which is $25 million, I think" (tr. 2/55, 65).

(tr. 2/161; R4, tab 53 at 626). Mr. Fletcher recalled that Ms. Waller "lost her temper" during a meeting held on Friday, 17 October 2008 (tr. 2/162; R4, tab 109). The incident was documented in a 20 October 2008 email from Mr. Benton[5] to ACO Murray[6] (app. supp. R4, tab 103). Mr. Benton wrote in part, "TSI has been subject to annual audits for nearly 2 decades, and this auditor's approach and behaviors are outside that which we have ever experienced" (*id.* at 2). Mr. Benton questioned Ms. Waller's "objectivity" (*id.*). Seven employees of TSI, two of whom were in the room, wrote memorandums documenting what they heard while the meeting was in process (tr. 2/231; app. supp. R4, tabs 108-14). Mr. Fletcher recalled that when he called ACO Murray[7] complaining about Ms. Waller, ACO Murray stated that TSI would not get an objective audit from Ms. Waller and that she (ACO Murray) would see that TSI got another auditor[8] (tr. 2/163). A meeting was held on 12 November 2008 between the government and TSI. ACO Murray and Ms. Waller were among the attendees. TSI asked that Ms. Waller be replaced (R4, tab 107 at 1). Minutes of the meeting indicate that the government decided not to replace Ms. Waller[9] (tr. 2/164; R4, tab 107 at 2-3).

7. Ms. Waller submitted her draft audit for peer review on 27 April 2009 (R4, tab 53 at 552). Before the FY 2007 audit could be completed, DCAA ordered all incurred cost audits stopped to focus on pricing audits that were holding up awards (tr. 1/38, 42-43). When TSI's incurred cost audit was stopped, Ms. Waller had completed a substantial amount of the work. Her draft audit questioned the following costs:

---

[5] Mr. Benton did not attend the meeting but it is well documented in the record (R4, tabs 108-14).

[6] ACO Murray was close to retirement and was replaced by ACO Cuellar (app. supp. R4, tab 122 at 1).

[7] Mr. Fletcher erroneously referred to ACO Cuellar in his account of the conversation, but the minutes of the 12 November 2008 meeting make it clear he talked to ACO Murray (R4, tab 107 at 3).

[8] At the 12 November 2008 meeting ACO Murray could not recall previously saying she would replace Ms. Waller but did not dispute that she probably did make that statement (R4, tab 107 at 3).

[9] The government did not call Ms. Waller as a witness at the hearing. The only explanation was that she was no longer with DCAA (tr. 2/259-60).

| Professional fees (overhead) | $51,340 (R4, tab 53 at 559) |
|---|---|
| Computer supplies (overhead) | $26,198 (*id.* at 562) |
| Conferences | $19,241 (*id.* at 565) |
| Severance pay | $4,212 (*id.* at 572) |
| Depreciation | $708 (*id.* at 573) |
| Professional fees (G&A) | $39,060 (*id.* at 576) |
| Corporate affairs labor (G&A) | $36,498 (*id.* at 581) |
| Travel (G&A) | $102 (*id.* at 583) |
| Health Insurance (Yoga) | $1,430 (*id.* at 589) |
| Bonuses | $39,150 (*id.* at 590) |
| Payroll taxes | $2,866 (*id.* at 594) |
| Holiday costs | $4,131 (*id.* at 595) |
| All other fringe expenses | $79,222 (*id.* at 596) |
| Direct labor | $2,184 (*id.* at 602) |
| Direct travel | $14,410 (*id.* at 603) |
| Subcontracting/consulting | $40,070 (*id.* at 608) |

The draft results were:

|  | Claimed by TSI | Audit determined |
|---|---|---|
| OH Rate | 127.64% | 92.48% |
| G&A Rate | 18.40% | 12.02% |
| Material OH Rate | 1.05% | 0.00% |

(R4, tab 53 at 557)

8. DCMA resumed TSI's incurred cost audit for FY 2007 in 2013 due to concerns over the statute of limitations (tr. 1/43). In April 2013 Ms. Winefield assigned Ms. Cote, senior auditor, to review the status of the TSI audit (tr. 1/44, 46; R4, tab 48). Ms. Cote submitted her findings in July 2013. She determined that more information was needed from TSI. (Tr. 1/44-47; R4, tabs 49, 50) Ms. Winefield then assigned Mr. Darcy, senior auditor, to complete the TSI audit (tr. 1/48).

9. By letter dated 18 March 2014 to ACO Cuellar,[10] Ms. Milshtein, DCAA, wrote that DCAA was unable to meet the required audit date and was withdrawing from "our engagement to audit the subject [TSI's] incurred cost proposal." DCAA agreed to provide "non-audit" service to assist DCMA in determining final rates for TSI in FY 2007 "based on the information readily available from the audit files." (Tr. 1/173-74, 230-32; app. supp. R4, tab 136) Also on 18 March 2014, DCAA provided ACO Cuellar

---

[10] Ms. Cuellar replaced Ms. Murray as DCMA's ACO for TSI (tr. 1/227).

a "decrement memo" itemizing the costs it questioned (tr. 1/52-53; R4, tab 4). The memo stated, "Providing this information does not constitute an audit or attestation engagement under generally accepted government auditing standards" (R4, tab 4 at 2).

10. After ACO Cuellar received DCAA's decrement memo she emailed Mr. Benton, providing him with a copy of the decrement memo, and requesting any additional data he might want to submit and set up a time to meet (tr. 1/233-34; R4, tab 5). ACO Cuellar offered to close-out the action without assessing a penalty if TSI would accept DCAA's questioned costs (tr. 1/235-36).

11. By email dated 23 April 2014 to ACO Cuellar, TSI did not accept the offer and instead submitted documents explaining its position (tr. 1/237-38; R4, tabs 6, 6(a)-6(g)). By email dated 6 May 2014, ACO Cuellar acknowledged TSI's "non-acceptance of the Government's offer" stating in part:

> We understand your argument that DCAA has historically not questioned these costs; however, that does not mean DCAA deems those costs to be allowable. We here at DCMA cannot speak for the DCAA auditor(s) that performed the reviews, nor can we speak for the sampling methodology used by DCAA. Our job will be to address the audit as written. If you are able to substantiate the costs with the required documentation, we will reinstate the costs. If not, we have to sustain the costs.

(Tr. 1/238; R4, tab 7) TSI replied submitting some additional information, but ACO Cuellar testified that most of it was what had already been submitted to DCAA. She was able to allow some additional costs based on the new information. (Tr. 1/237-40; R4, tab 9, 9(a)-(e)) ACO Cuellar testified that she continued to attempt to negotiate with TSI requesting additional documentation such as evidence of approval of subcontracts by the ACO, meeting notes, trip reports, bonus plan information, etc. (tr. 1/242-45). By email dated 15 May 2014 to ACO Cuellar, TSI provided a statement to the effect that it was no longer interested in negotiations (tr. 1/245; R4, tab 13, 13(a)). In the statement Mr. Benton wrote:

> TSI had a long established track record of never having any significant issues result from DCAA audits. All of the procedures and guidance in place had resulted in TSI's rates being accepted as admitted [sic] in the 5 years prior (2002-2006).

36

There is no manner in which TSI could have foreseen the DCAA audit findings for 2007. It is obvious that the management team was competent, diligent, and operating TSI in good faith insofar as accounting for all costs. Indeed, any similar management team would have operated TSI in the same manner in 2007.

Why DCAA chose to totally alter their previous stances in 2007 is a mystery. But DCAA has set into motion a process that will result in TSI's bankruptcy unless DCMA recognizes the fundamental lack of fairness in DCAA's findings and positions. There is plenty of evidence already provided by TSI to substantiate this.

....

The bottom line is that DCAA's claims were generally unfair and improper, and if they are allowed to stand to any substantial extent, there are no funds existing to recoup costs that are disallowed. No change in TSI's accounting practices would occur, because TSI has no revenues that are subject to DCAA audit anymore. The end result would be to force a company that has been recognized as an excellent contractor to the US military to cease operations, and the government to recoup virtually nothing.

(R4, tab 13(a) at 212-13)

12. By email dated 14 April 2014 to ACO Cuellar, Mr. Darcy forwarded a "TSI Negotiation Support Spreadsheet" he prepared for TSI's FY 2007 ICP (tr. 1/214-16; R4, tabs 58-59). The spreadsheet included the following:

Draft audit results questioned almost all of the labor costs in the corporate affairs labor account since the contractor could not provide detail of the labor hours by activity. Undoubtedly there is some directly associated unallowable labor in here related to other unallowable costs we questioned in the draft audit results and carried forward to the decrement memo. *However, it looks like a hard line was taken in the draft audit results because the contractor was not providing the breakout of the labor costs comprising this account in the form the auditor*

37

*requested.* For the purposes of the decrement memo we
dropped this issue since more work still needed to be done
to quantify the labor associated with the unallowable
activities (i.e. TSI management interaction with SMI,
patents, etc.).

(R4, tab 59 at 1466) (Emphasis added) Ms. Winefield testified that Mr. Darcy did not include unallowable "activities" in the decrement memo because of his perception that the auditors took a "hard line" (tr. 1/218-19).

13. Ms. Winefield prepared a Weekly Significant Activity Report for the week ending 13 June 2014 wherein she wrote, "Due to an impending Statute of Limitations date and per the request of DCMA, we prepared a decrement recommendation based on the findings from transaction testing that was performed to date on FY 2007 costs" (tr. 1/212; R4, tab 66). She testified that DCAA calculated that the six-year limitation period would run out on 25 June 2014 (tr. 1/213).

14. By email dated 12 May 2014 to ACO Cuellar, Mr. Benton provided information in response to ACO Cuellar's questions (tr. 2/40; app. supp. R4, tab 156). Concerning professional fees, ACO Cuellar requested information such as "trip reports, minutes of meetings, collateral memoranda and reports" to support the costs (app. supp. R4, tab 156 at 1). Mr. Benton attached a file summarizing Strategic Marketing Innovations, Inc.'s (SMI's) activities in FY 2007 and wrote:

An issue with the 07 SMI documentation is that we were
not made aware of an increased documentation
requirement until 08. The files that are attached are from
our accounting records, and refer to additional notes that
Tom Zysk (company president at the time) would have.
Unfortunately, Tom Zysk retired several years ago and
his computer files are no longer on file and thus we have
no way to forensically gather that information. Much of
Tom's interactions were verbal. That said, the work
performed by SMI was fundamentally the same for each
year from 2002 through 2009, there were no changes to
the contractual relationships or what they did. We were
able to more comprehensively document in 2008-2009
their business development activities, which included
attending conferences to identify potential business
opportunities, supporting our visits to DC area clients,
and so forth.

38

(*Id.*) Mr. Benton also attached a file that gave examples of computer equipment that was expensed "due to short life" (*id.*). Mr. Fletcher discussed depreciation of computers. Some computers were for research and were "taken apart, components soldered on, sensors added in" and built into systems that would go out on vehicles/boats for testing (tr. 2/131, 205). They were "heavily modified" (tr. 2/221-22). After testing was complete the computer was "no good" to TSI and it was "expensed" (tr. 2/131-32). TSI also bought computers that were used on desks for routine office work and those computers were capitalized/depreciated (tr. 2/132). Computers that were consumed in the research work were not depreciated, but were expensed (tr. 2/133-34). Mr. Benton explained that even though the bonuses were paid in 2008 they were based on performance in 2007 (*id.*). He attached 2007 cost proposals for software license fees (*id.*). Finally he attached an email from Mr. Almquist former program manager and contracting officer technical representative (COTR) for the Office of Naval Research (ONR) confirming that TSI's "subcontractor, consultant, and equipment costs incurred were in support of the SOW" (app. supp. R4, tab 156 at 3). ACO Cuellar testified that she did consider this email from the COTR but that she "didn't look at it for fair and reasonable pricing" and he wasn't a contracting officer (tr. 2/44). Mr. Benton also provided emails from Mr. Devin, ONR, and Mr. Cascioli, project officer, both verifying that ODC costs incurred by TSI under contract 0340 "were in support of the SOW" (app. supp. R4, tab 157). ACO Cuellar testified that this information was insufficient because she could not make a determination that the costs were fair and reasonable (tr. 2/49-52).

15. ACO Cuellar signed her 23 June 2014 contracting officer's final decision (COFD) setting the final determination of TSI's rates and asserting a claim for $159,303 (tr. 1/153; R4, tab 16). Her decision is summarized as follows:

39

| Note | DISALLOWED OVERHEAD |
|---|---|
| Note 1 Professional Fees $51,340 | Although SMI's lobbying fees were voluntarily removed, TSI failed to present adequate documentation such as white papers, trip reports, meeting minutes, reports, etc., showing that the costs were allowable (tr. 1/253-56; R4, tab 16 at 258). |
| Note 2 Computer Supplies $26,198 | TSI expensed the full value of computers purchased in FY 2007 in FY 2007 that should have been depreciated over five years (Tr. 1/257-58; R4, tab 16 at 258-59). |
| Note 3 Conferences $2,604 | Unallowable entertainment costs. TSI agreed. (Tr. 1/259; R4, tab 16 at 259) |
| Note 4 Fringe $25,698 | Bonuses[11] that were not supported by a plan and were partially incurred in FY 2008 (tr. 1/260-62; R4, tab 16 at 259-60). |
| | DISALLOWED G&A |
| Note 5 Professional fees $39,060 | Legal fees, $34,429 to deal with criminal investigation. Should have claimed in FY 2006 and only entitled to 80%. $2,925 for lack of documentation for Mr. Wilson. $706 expressly unallowable. $1,000 for preparation of personal tax returns. (Tr. 1/262-264; R4, tab 16 at 260-67) |
| Note 6 Conferences $577 | Exceeds maximum per diem for lodging and meals (tr. 1/267; R4, tab 16 at 261). |
| Note 7 Fringe $4,269 | See Note 4 Fringe above (tr. 1/267-68; R4, tab 16 at 261). |
| Note 8 B&P Overhead $2,417 | Difference between claimed overhead B&P labor to the adjusted rate of 109.88% (tr. 1/268; R4, tab 16 at 261). |
| | DISALLOWED DIRECT COSTS |
| Note 9 $1,074 | Exceeds maximum per diem rates (tr. 1/268; R4, tab 16 at 261). |
| Note 10 $3,127 | $466 exceeds maximum per diem rates. $2,661 failure to receive consent to subcontract and failure to provide substantiation. (Tr. 1/270-71; R4, tab 16 at 261-62) |
| Note 11 $30,554 | $1,986 exceeds maximum per diem rates. $28,568 failure to receive consent to subcontract and failure to provide substantiation. (Tr. 1/271-273; R4, tab 16 at 262) |

ACO Cuellar did not know if the problems identified in 2007 existed in earlier years (2002 to 2006) or not (tr. 2/61, 63).

*FYs 2008 & 2009 Audits*

16. Ms. Henriquez-Aguilar was the DCAA auditor who conducted the FY 2008 and FY 2009 audits at TSI (tr. 1/278, 285). By email dated 7 May 2014 to ACO Cuellar, Mr. Benton informed her that during the FYs 2008 & 2009 audit out-brief, Ms. Henriquez-Aguilar told him that SMI's costs "were deemed allowable without exception" (tr. 1/158, 280; app. supp. R4, tab 148 at 3658). ACO Cuellar wanted to verify Mr. Benton's statements in the email (tr. 1/287; app. supp. R4, tab 148 at 3657). By email dated 8 May 2014 to Ms. Henriquez-Aguilar, ACO Cuellar asked her to "explain the differences between what DCAA found in FY07 and FY08/09" (tr. 2/287; app. supp. R4, tab 148 at 3657).

17. By email dated 8 May 2014 to ACO Cuellar, Ms. Henriquez-Aguilar responded:

> Based on my review of invoices in 2008 and 2009 all lobbying costs were voluntarily removed as unallowable, and only costs related to marketing were claimed. Based on my evaluation I consider the 2008 & 2009 direct selling costs allowable per FAR 31.205-38(b)(5).
>
> I am not sure what support was provided in FY 2007 as I did not complete the audit, but for the years I examined I was able to differentiate between what was allowable and not allowable, and I have confirmed that all unallowable expenses were excluded from the claims

(Tr. 1/280, 287; app. supp. R4, tab 148 at 3656-57) Ms. Henriquez-Aguilar testified that her conclusion was based on only her review of the invoices (tr. 1/281). She testified that at the time of the out-briefing she told Mr. Benton that the direct selling costs were allowable and Mr. Benton's 7 May 2014 email to ACO Cuellar was correct (tr. 1/281; app. supp. R4, tab 148 at 3658).

18. By email dated 13 May 2014 to Ms. Henriquez-Aguilar and ACO Cuellar, Ms. Winefield stated that in FY 2007 TSI "was unable to provide adequate work products for us to determine the extent of allowable marketing services that were being performed" (R4, tab 10 at 148). She stated that she thought "it is very likely that TSI

---

[11] Prior to 2007 TSI did not have an executive compensation plan (tr. 2/183).

41

started keeping better documentation for FY 2008 and FY 2009" which "may explain why our audit of those years rendered a different opinion on the SMI costs" (*id.*).

19. By email dated 9 June 2014 to Ms. Winefield, Mr. Cook, DCAA, stated:

> Mary and Peter – on with headquarters relating to the 2007
> audit now for TSI. Headquarters wants to insure offices
> closely coordinate so we are taking same position on same
> type of issues and no instances of same information
> provided but different DCAA positions.

(Tr. 1/159; app. supp. R4, tab 126 at 4038)

20. In June 2014 Ms. Winefield compared the TSI's FY 2007 audit documents with FYs 2008/2009 and concluded that they were essentially the same except that in the later audits a Scope of Work was included for SMI. In a 12 June 2014 email to Ms. DeCourcy, DCAA, Ms. Winefield wrote:

> *Unfortunately, I think the difference between the FY 2007
> and FY 2008/FY 2009 audit is auditor judgment.* It doesn't
> look to me that TSI was providing much better support in
> FY 2008/FY 2009 than what we saw in FY 2007. I looked
> through the attachments and I would agree with Peter that
> the major difference in what VIC team got is that the
> SOWs attached to the agreements in FY 2009 were
> updated.

(App. supp. R4, tab 123 at 4358; tr. 1/160-63) (Emphasis added)

21. Ms. Henriquez-Aguilar explained that when DCAA received a congressional inquiry from Senator Susan Collins (app. supp. R4, tab 130 at 1) about TSI's FY 2007 audit, she met with her supervisor and manager and they decided "it was a good idea to expand testing, to make sure that we weren't missing anything in this area, and that's when I contacted technology systems again, and I asked for 100 percent of what was claimed for 2008 and 2009, for invoices and any supporting documents" (tr. 1/285, 296-98). As a result of this expanded testing, in Ms. Henriquez-Aguilar's draft and 29 July 2014 final audit report for FYs 2008 & 2009[12] she questioned SMI's professional costs, dues & subscriptions, conferences, and computer supplies (tr. 1/284,

---

[12] Ms. Henriquez-Aguilar testified that TSI's support for its costs improved in
    FY 2009 from what it had in FY 2008 (tr. 1/289-90).

42

289-90; app. supp. R4, tab 150; R4, tab 70 at 1535-36).[13] The results of this expanded testing were provided to Senator Susan Collins (R4, tab 130). At the hearing, Ms. Henriquez-Aguilar agreed that she would not have expanded her testing if it had not been for TSI's congressional inquiry and the resulting congressional inquiry to DCMA/DCAA (tr. 1/285-86, 288-89).

*TSI Cost Documentation Did Not Change for 2002 through 2008*

22. Mr. Zysk was COO for TSI from 2005 through 2012 (tr. 2/73, 76, 102). Mr. Zysk testified that since he arrived at TSI in 2005, he didn't recall the DCAA auditors having anything negative to say until 2007. The only difference between the earlier years and 2007 was the auditor. (Tr. 2/115) Mr. Zysk testified that the work SMI did for TSI was essentially the same from 2005 when he started with TSI until 2007 (tr. 2/102, 105, 107). They did not create minutes of phone conversations (tr. 2/107-08).

23. Mr. Fletcher was CFO for TSI from 2004 through 2014 (tr. 2/117). Mr. Fletcher testified that he paid "extreme attention" to what the DCAA auditors said when they visited TSI.[14] In 2004 to 2006 the auditors looked at SMI invoices and found them acceptable so he felt they must be "appropriate." (Tr. 2/119) The DCAA auditors were one of Mr. Fletcher's "primary sources of information and expectations" (tr. 2/120, 185). Mr. Fletcher testified that prior to 2007 when the DCAA auditors came, they always looked at professional fees, SMI and Mr. Chuck Wilson, and they "never, ever had a problem prior to 2007 with the level of documentation" (tr. 2/160). This testimony is corroborated by documents in the record. The record includes monthly "activity" memorandums (invoices) from SMI[15] for April, June, July, August, September, October, November, and December 2006 (app. supp. R4, tab 141 at 1-7). The record also includes Ms. Waller's working papers for her 2007 audit that includes similar SMI memorandum that are heavily annotated that I infer is Ms. Waller's[16] handwriting. The annotations include questions about the adequacy of support for the memorandums such as "No work product! i.e. reports." (R4, tab 53 at 1139) Similar handwritten

---

[13] ACO Cuellar issued a final decision demanding payment of $60,365 for overpayments in FYs 2008 and 2009 that was appealed, docketed as ASBCA No. 60126 and stayed by the Board at the request of the parties pending the outcome of this appeal.

[14] The government elicited testimony from Ms. Winefield that DCAA auditors are not allowed to provide guidance to contractors (tr. 2/251-52).

[15] These memorandums are not on SMI letterhead, however, they are from Mr. Peterson, the same person on the 2007 memorandums that are on SMI letterhead (R4, tab 53 at 1139).

[16] We must infer this because the government did not produce Ms. Waller at the hearing (tr. 2/259-60).

43

annotations appear on all of the 2007 SMI memorandums (R4, tab 53 at 1139, 1146, 1188, 1194, 1219, 1228, 1253, 1266, 1277). In any event, the SMI memorandum that were accepted without question in the FY 2006 audit were almost identical to those questioned in the FY 2007 audit. Mr. Fletcher testified, "It was my intent to do things exactly as DCAA wanted us to do." (Tr. 2/160) TSI was "following business practices that had been approved from 2002, '3, '4, '5, and '6 by DCAA as submitted.[17] To me that's a pretty good testimony that you're doing things properly and we didn't change - - other than the bonus plan we didn't change anything in 2007 or '8 or '9." (Tr. 2/214-15) Since the 2007 audit didn't actually take place until almost the end of 2008, TSI did make some changes in documentation in 2009 (tr. 2/216).

24. Ms. Pepin (now Ms. Tremblay) was a DCAA auditor in 2007 (tr. 2/5). Mr. Fletcher recalled Ms. Pepin's visit to TSI on 20 February 2008 (tr. 2/121). She was there to review TSI's proposed rates for 2008 (id.; app. supp. R4, tabs 151, 177). They discussed TSI's executive bonus plan and he provided documents that she photocopied and took with her (tr. 2/122-23, 142, 190). Mr. Fletcher testified that he and Mr. Zysk were hired at "salaries considerably below our last jobs" with the expectation that if the company did well they would share in the rewards (tr. 2/138-39). They discussed professional fees because it was one of the bigger numbers under overhead (id.). When Ms. Pepin left she stated that everything looked fine to her (id.). Ms. Pepin testified at the hearing but when asked, she could not recall her meeting with Mr. Fletcher (tr. 2/13).

25. Mr. Benton testified that TSI "had been through many audits and those audits were while we were under contract with the government, subject to FAR interpretation. And those audits set the standard. And the fact that the government wants to change that standard yet doesn't notify us is sort of applying a different standard to the government's side of fence than they're trying to apply to us." (Tr. 2/225) Mr. Benton testified, "the fact that we had operated the company since 1985 and never had any issues, ever, and then have this fiasco, just makes me shake my head. I get asked to speak at SBIR [Small Business Innovative Research program (tr. 177-78)] conferences, I won't anymore. I tell people, don't do business with the government, you can't trust them." (Tr. 2/240)

*Appeal*

26. TSI appealed the 23 June 2014 final decision by letter dated 17 September 2014.

27. The Board docketed the appeal as ASBCA No. 59577 on 18 September 2014.

---

[17] There are no DCAA working papers from 2002 to 2006 in the record so I rely on sworn testimony to reach my conclusions.

## DECISION

The parties in their post-hearing briefs[18] discuss each of the costs disallowed in ACO Cuellar's final decision. Because I analyze this appeal from two perspectives, "retroactive disallowance" and "course of dealing," I do not look at all individual costs. As explained below, I conclude that both "retroactive disallowance" and "course of dealing" support my decision to sustain TSI's appeal in part.

*Preliminary Matters—Time Bar*

TSI asserts that DCMA's final decision is barred by the CDA's six-year time bar (app. br. at 2, 5, 11). As DCMA correctly points out, TSI has the burden of proof in this argument (gov't reply br. at 15). This argument fails because TSI's FY 2007 ICP was submitted 25 June 2008[19] (finding 6). Six years from 25 June 2008 is 25 June 2014. The final decision was issued on 23 June 2014, within the six-year period. It is not as close as it seems because the date of the ICP typically does not start the running of the six-year period, but it is the earliest possible date. *Combat Support Associates*, ASBCA Nos. 58945, 58946, 14-1 BCA ¶ 35,782 at 175,041-42 (Claim does not "accrue" upon submission of the Incurred Cost Submission until there is sufficient supporting data to establish government knowledge of the claim.). I need not discuss the other attempts by TSI to persuade us that certain aspects of the government's claim are time-barred other than to say I agree with DCMA's analysis concluding that TSI's arguments are unpersuasive (gov't reply br. at 17-24).

*Preliminary Matters – Auditor "Independence"*

While TSI "concedes" that its argument that the final decision should be "vacated" due to "impaired Auditor Independence" is unsustainable (app. br. at 3), it included supporting evidence and argument in the record and brief. I therefore address it. There is evidence in the record that TSI's concern over DCAA's FY 2007 auditor's behavior may have been justified (finding 6). There is even evidence that DCAA and DCMA had concerns over the auditor's work (findings 6, 12, 16, 19, 20). However, the record does not support a finding that the auditor was biased against TSI and that said bias influenced her recommendations to such an extent that it would justify sustaining this appeal.[20]

---

[18] By letter dated 21 March 2016 the Board invited the parties to address course of dealings in their reply briefs. After receipt of the reply briefs there was no request from either party for additional briefing.

[19] DCMA contends the date was 30 June 2008 (gov't reply br. at 13, 16) but there is no need to sort this date out because the result is the same for both.

[20] The government did not call Ms. Waller as a witness apparently since she was no longer with DCAA (finding 23 n.16).

45

*Retroactive Disallowance*[21]

ACO Cuellar's 23 June 2014 final decision disallowed costs incurred in 2007 (finding 15). This final decision was the first official notice to TSI that DCAA's practice of accepting TSI's documentary support for its costs and final rates in years 2002 to 2006 was going to change. Therefore, these facts raise the issue of "retroactive disallowance."

The term retroactive disallowance" is a bit of a misnomer. If taken literally one could conclude that for it to apply, DCAA / DCMA would have to have disallowed costs that had previously been approved, i.e., costs for FY 2002 through 2006. To so hold would render the commendable goal of fundamental fairness and consistency of audit standards set forth in the law discussed below meaningless. I rely heavily on *Gould Defense Systems, Inc.*, ASBCA No. 24881, 83-2 BCA ¶ 16,676. *Gould* is a complicated accounting case, but it relies on *Data-Design Laboratories*, ASBCA No. 21029, 81-2 BCA ¶ 15,190. In *Data-Design* the company allowed first class air travel from 1966 through 1972 with DCAA's knowledge and the costs were not questioned. For the first time the costs for 1973 were disallowed in a DCAA Form 1 issued in 1975. This Board considered this to be retroactive disallowance even though no previously allowed costs were disallowed. This is directly analogous to what happened in TSI.

Retroactive disallowance is a "special application of estoppel principles." *Gould*, 83-2 BCA ¶ 16,676 at 82,981. The Board in *Gould* explained:

> This rule is to be compared with the related precept that the Government may not disallow retroactively historical costs where: the cost or accounting method in question previously had been accepted following final audit of historical costs; the contractor reasonably believed that it would continue to be approved; and it detrimentally relied on the prior acceptance. *See e.g., Data-Design Laboratories*, ASBCA No. 21029, 81-2 BCA ¶ 15,190 (and cases cited). The retroactive disallowance rule applies regardless of the allowability of the historical cost under the Defense Acquisition Regulations and requires that the Government only may disallow the cost or method prospectively. (*Id.*) Final determination of costs or acceptance of an accounting methodology as a result of the audit called for in the "Allowable Cost, Fee and Payment" clause precludes the Government from disallowing even

---

[21] This issue was raised *sua sponte*.

46

> unallowable costs incurred prior to notice by the
> Government that its prior acceptance was rescinded.

*Id.* After discussing the facts and granting relief the Board in *Gould* explained the principle behind its decision:

> The contrary position suggested by the Government
> essentially rests on the hypothesis that a Government agent
> can do no wrong if he misinterprets a cost accounting
> standard even though the contractor reasonably relies on
> the misinterpretation. We believe the contractors are
> entitled to a greater degree of certainty in their financial
> dealings with the Government. Once the Government
> unequivocally takes its stand and reads and applies the
> standard in the same manner as the contractor, it is
> essential that the contractor be entitled to rely on that joint
> interpretation until notified otherwise. This rule is
> essential to the orderly conduct of business with the
> Government and is applicable irrespective of whether a
> Defense Acquisition cost principle or a Cost Accounting
> Standard is involved.

*Id.* at 82,984. I agree whole heartedly with this goal.

The critical issue to decide is if the defense of retroactive disallowance, like traditional estoppel, requires the additional element of "affirmative misconduct":

> The Supreme Court also has held that estoppel may run
> against the government, but that "the Government may not
> be estopped on the same terms as any other litigant." A
> plaintiff "also must show that the government engaged in
> 'affirmative misconduct.'"

*Kingman Reef Atoll Development, L.L.C. v. United States,* 116 Fed. Cl. 708, 767 (2014) (citations omitted). The Board has not unambiguously applied the requirement of proving affirmative misconduct to retroactive disallowance. In *United Technologies Corp, Pratt & Whitney,* ASBCA No. 47416 *et al.,* 06-1 BCA ¶ 33,289 the Board dealt with a remand from the Court of Appeals for the Federal Circuit (CAFC). The CAFC wrote:

> A final argument raised by Pratt before the Board
> was that the government is estopped from contesting Pratt's
> determination that the revenue payments for parts acquired
> under the collaboration requirements did not constitute

47

costs. This is said to be so because of the government's prior acceptance of Pratt's treatment of those items. *United Techs.*, 01-2 BCA ¶ 31,592, at 53 [sic]. Based on its interpretation of "cost," the Board did not reach this issue. *Id.* This question, therefore, remains open on remand. Adjudication of the estoppel issue must proceed under the "well settled [rule] that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Beyond a mere showing of acts giving rise to an estoppel, Pratt must show "*affirmative misconduct* [as] a prerequisite for invoking equitable estoppel against the government." *Zacharin v. United States*, 213 F.3d 1366, 1371, 55 USPQ2d 1047, 1051 (Fed. Cir. 2000) (emphasis added).

*Rumsfeld v. United Technologies Corp., Pratt & Whitney*, 315 F.3d 1361, 1377 (Fed. Cir. 2003). Retroactive disallowance was not mentioned in the Board's original decision. *United Technologies Corp., Pratt & Whitney*, 01-2 BCA ¶ 31,592. The CAFC did not mention retroactive disallowance in its remand guidance. However, Pratt & Whitney did mention retroactive disallowance in its argument in the remand case. *United Technologies*, 06-1 BCA ¶ 33,289 at 165,050. This Board did not mention retroactive disallowance in its remand decision. *Id.* at 165,058 ("We, therefore, will follow the guidance provided by the CAFC in deciding the estoppel issue in these appeals and require that appellant demonstrate some form of affirmative misconduct...."). Given the CAFC's remand guidance and this Board's failure to specifically refer to retroactive disallowance, I do not interpret this Board's use of the term "estoppel issue" to definitively mean "retroactive disapproval." This position is supported by a more recent decision where this Board did not apply affirmative misconduct to retroactive disallowance. In *Raytheon Co.*, ASBCA No. 57576 *et al.*, 15-1 BCA ¶ 36,043, we considered both retroactive disapproval and equitable estoppel. With respect to retroactive disallowance the Board held:

> We have applied the retroactive disallowance principle to bar recovery of government claims. *Lockheed Martin Western Development Laboratories*, ASBCA No. 51452, 02-1 BCA ¶ 31,803. However, its application is largely fact-dependent. In these appeals, there are material factual disputes of record that need to be addressed to determine whether this principle is applicable here, including but not limited to, whether or not the government, with knowledge, consistently approved the subject BAIC and TSR metric costs; and if so, when the

> government first put appellant on reasonable notice that
> said costs were unallowable. Given these material fact
> disputes, we decline to award summary judgment to either
> party on this defense. *See Peat, Marwick, Mitchell & Co.*,
> ASBCA No. 29847, 86-2 BCA ¶ 18,915 at 95,400.

*Id.* at 176,055. With respect to equitable estoppel the Board held:

> We further held that this added requirement of
> affirmative misconduct contemplates government
> misconduct "of a nature more compelling than the conduct
> that would otherwise apply against a private party. *See,
> e.g., RGW Communications*, 05-2 BCA [¶] 32,972 at
> 163,336 (referencing deliberate lies; a pattern of false
> promises, or intentional deception as examples of
> affirmative misconduct)." *Northrop Grumman*, 14-1 BCA
> ¶ 35,501 at 174,024.

> Based upon the foregoing, we believe that Raytheon
> has failed to adduce any evidence to support a finding of
> affirmative misconduct by the government here. Hence,
> Raytheon has failed to adduce evidence necessary to
> support its estoppel defense as a matter of law. We grant
> summary judgment to the government on appellant's
> defense of equitable estoppel.

*Id.* at 176,055-56. This decision does not apply affirmative misconduct to retroactive disallowance; if it did summary judgment would have also been granted to the government as to the defense of retroactive disallowance.

Although not discussed in any case law found, I believe it is appropriate to treat retroactive disallowance and traditional estoppel differently. This is because traditional estoppel is a permanent prospective bar to the government's action; retroactive disallowance is not. In retroactive disallowance the government may change its standard and disallow costs it had previously allowed, i.e., the "estoppel" only applies between the previous approval(s) and the point when the government provides notice to the contractor that it will impose a different standard in the future. I therefore do not impose the requirement for affirmative misconduct to retroactive disapproval. I would sustain the appeal in part based on retroactive disapproval. However, I admit my concern over a possible alternative interpretation of *United Technologies*, 06-1 BCA ¶ 33,289, so I consider an alternative theory to reach the goals of the "greater degree of certainty in their financial dealings with the Government" and "orderly conduct of business with the Government" set forth in *Gould* and quoted above.

49

*Course of Dealing*[22]

At least one case suggests that "course of dealing" provides an alternative to retroactive disallowance. In a case involving the disallowance of post-retirement benefits (PRB), this Board found that appellant failed to prove affirmative misconduct and "The government did not mislead appellant with respect to the allowability of the unfunded PRB costs in dispute here, nor did the parties have a course of dealing with respect to them." *Northrop Grumman Crop.*, ASBCA No. 57625, 14-1 BCA ¶ 35,501 at 174,024. In the Board's decision denying Northrop Grumman's motion for reconsideration we again held that appellant had not proven either affirmative misconduct or course of dealing. *Northrop Grumman Corp.*, ASBCA No. 57625, 14-1 BCA ¶ 35,743 at 174,930. I therefore, evaluate the applicability of course of dealing in this appeal.

At the outset I accept the testimony of Messrs. Benton, Zysk and Fletcher that TSI did not change its contracting, record keeping and accounting practices for 2002 through 2007, and that DCAA was satisfied with TSI's documentation and accepted TSI's proposed final indirect rates without question for the years 2002 through 2006 (findings 22-25). Messrs. Benton, Zysk and Fletcher testimony is corroborated by Ms. Winefield (finding 20). The 2002 to 2007 audits included invoices from SMI and Mr. Wilson (findings 11, 14, 20, 22-25). It is also noteworthy that the initial audit of TSI's rate submission for FY 2008 and FY 2009 continued the practice from 2002 to 2006 of accepting TSI's proposed rates without question until the "expanded testing" occasioned by TSI's congressional inquiry disallowed costs (finding 21).

DCMA explains that "each cost year stands on its own" and that since each audit "is dependent upon the particular auditor's assessment of the risk" there can be no course of dealings (gov't reply br. at 25). I reject DCMA's argument that there need be no consistency in DCAA's audit practice with respect to a given contractor over the years. I also reject DCMA's apparent position that it has no discretion to question DCAA's recommendations unless additional substantiation is forthcoming from the contractor (finding 11).

The record reflects a glimmer of understanding of the problem in Mr. Cook's 9 June 2014 email stating that DCAA "headquarters wants to insure offices closely coordinate so we are taking same position on same type of issues and no instances of same information provided but different DCAA positions" (finding 19). Similarly in Ms. Winefield's 12 June 2014 email, "Unfortunately, I think the difference between the FY 2007 and FY 2008/FY 2009 audit is auditor judgment. It doesn't look to me that TSI was providing much better support in FY 2008/FY 2009[23] than what we saw

---

[22] The Board raised the issue of course of dealing *sua sponte* and requested that the parties discuss it in their reply briefs.

[23] This was before the relook of TSI's FYs 2008, 2009 rate submissions (finding 21).

in FY 2007." (Finding 20) Unfortunately this glimmer of understanding was not translated into action to protect TSI. TSI closed its doors in August 2014, one month after Ms. Henriquez-Aguilar's 29 July 2014 audit report of TSI's FYs 2008 and 2009 incurred costs based on her "expanded testing" caused by TSI's congressional inquiry. (Findings 1, 17, 21)

I start with the Restatement:

§ 223 Course of Dealing

(3) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(4) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.

RESTATEMENT (SECOND) OF CONTRACTS § 223 (1981). The Board has relied on Restatement, Section 223, Course of Dealing in past decisions. *BAE Systems Technology Solutions & Services, Inc.*, ASBCA No. 57581, 13 BCA ¶ 35,414 at 173,742 (citing *C.R. Pittman Constr. Co.*, ASBCA No. 54901, 08-1 BCA ¶ 33,777 at 167,178; *T&M Distributors, Inc.*, ASBCA No. 51405, 00-1 BCA ¶ 30,677 at 151,509).

DCMA also quotes the Restatement in its reply brief (gov't reply br. at 27). However, DCMA narrowly interprets the Restatement, stating "[c]learly this rule [the Restatement] applies only in those instances where the parties have formed an agreement and the course of dealing gives meaning to that agreement" (*id.*). I disagree with this narrow interpretation. The Restatement is clear that a course of dealing may be based on conduct, "previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." RESTATEMENT (SECOND) OF CONTRACTS § 223. It is the conduct of DCAA, DCMA and TSI for FYs 2002 to 2006 that forms the basis of a course of dealing.

The first element of the Restatement is the "parties to an agreement" requirement. The Board has held that "[j]ustifiable reliance of a prior course of dealing requires proof of the same contracting agency, the same contractor, and essentially the same contract provisions." *Tekkon Engineering Co.*, ASBCA No. 56831, 10-2 BCA ¶ 34,563 at 170,441. TSI's contracts were with the Navy, not DCAA or DCMA (finding 2). DCMA sees this issue but its analysis falls short arguing that DCAA "is not a contracting agency nor are there any contractual

agreements between DCAA and TSI that the Board could attempt to interpret" and "the course of dealing rule is simply inapplicable" (gov't reply br. at 28-29). I do not see this as an impediment to applying "course of dealing" for several reasons. First, the final decision was issued by DCMA based on DCAA's "non-audit" service to assist DCMA (findings 9, 15). Second, contract clause FAR 52.215-2, Audit and Records – Negotiation (finding 3), subjects TSI to audit by the "authorized representative of the Contracting Officer" and those representatives are DCAA and DCMA. Finally, the actions of DCAA and DCMA are imputed to the Navy based on the "close relationship" or "significant bond" between DCMA, DCAA and the Navy established by the contract and government regulations. *See Raytheon Missile Systems Company*, ASBCA No. 57594, 13 BCA ¶ 35,264 at 173,112-15 (DESC's decision to raise the price of JP-10 fuel was imputed to NAVAIR because of the "significant bond" between the sole supplier of JP-10 DESC and NAVAIR). As far as the same contract provisions, DCAA applied FAR Part 31, Contract Cost Principles and Procedures, in its audits and there is no evidence that these provisions changed in any significant way from 2002 to 2007. The government is silent as to the validity of the audit standards between 2002 and 2006 arguing that the prior audits are irrelevant. However, if different auditors interpreted FAR Part 31 differently in 2002 to 2006 than in 2007, that course of dealing set a standard TSI was entitled to rely upon. *Comptech Corp.*, ASBCA No. 55526, 08-2 BCA ¶ 33,982 at 168,086 ("to nullify an unambiguous specification requirement based upon conduct, one must show: actual knowledge by both parties of consistent conduct by one party in its contract dealings with the other over an extended period of time regarding a particular contract provision upon which the other is reasonably entitled to rely"). A corollary to this is the requirement for "mutuality." *DCX-CHOL Enterprises, Inc.*, ASBCA No. 54707, 08-2 BCA ¶ 33,889 at 167,729 ("The missing element is mutuality, *viz.*, the 'actual knowledge by both parties of the prior course of dealing and its significance to the contract.'"). It is clear that both TSI and DCAA/DCMA understood the significance of the audits, the standards imposed and the acceptance without question of TSI's indirect rates for five years prior to 2007 – there is mutuality.

The Board has applied course of dealings in cases similar to this. Evidence of costs that have been routinely invoiced and paid can establish a course of dealing. *Blue Cross Association and Blue Shield Association*, ASBCA No. 25778, 89-2 BCA ¶ 21,840 at 109,907 n.41 ("disallowing costs is a Government claim, not a contractor claim, absent a formal demand by the contractor, at least where the costs have been routinely invoiced and paid in the past and it is the Government seeking to change a past course of dealing"). Course of dealing has been applied to G&A. *Ford Aerospace and Communications Corp., Aeronutronic Division*, ASBCA No. 23833, 83-2 BCA ¶ 16,813 at 83,631 n.3 ("This prior course of dealings by the parties with respect to a substantial portion of appellant's G&A pool reinforces our conclusion that greater benefits from G&A are furnished to labor intensive contracts in appellant's circumstances.").

52

Consistent with course of dealing, a presumption of reasonableness attaches where a contractor's cost allocation practices are consistently applied by the contractor and accepted by the government:

> Once it has been determined that an otherwise allowable and reasonable indirect cost item is allocable to Government contracts under the specific benefit standard of DAR 15-201.4(ii), the salient question affecting the amount of cost that will be allowable is the reasonableness of the contractor's cost allocation method. A presumption of reasonableness ordinarily attaches to cost allocation practices that are consistently applied and followed by the contractor. Such consistently applied accounting practices will be disturbed only upon a persuasive showing by the Government that, due to particular circumstances, further use of that practice would be inequitable.

*Martin Marietta Corporation*, ASBCA No. 25828, 84-1 BCA ¶ 17,119 at 85,255 (citations omitted).[24]

Now I consider the evidence of the dealings between DCAA/DCMA and TSI during years 2002 to 2006. I do not ignore the fact that the 2001 DCAA audit disallowed professional fees for similar reasons professional fees were disallowed in the FY 2007 audit (finding 5). However, I do not know what, if any, changes were made in TSI's record keeping in 2002 and it is undisputed that DCAA accepted TSI's records, costs and indirect rates without question in years 2002 to 2006 (*id.*). I understand that in 2004 and 2005 DCAA conducted desk reviews rather than full audits, but that was DCAA's decision based on its conclusion that "after review of TSI's ICP, DCAA determined that there was a low risk that the ICP contained unallowable costs" (*id.*). I also note that DCAA's practice suggests that the 2007 audit could have been a desk review (*id.*). The desk reviews in no way diminish the importance of years 2004 and 2005 in evaluating a course of dealings. I also understand that there is no "magic number" of contracts that must be performed before course of dealing is established, "the parties' prior dealings must be regular and/or numerous enough to cause a reasonable expectation that the conduct relied upon was not mere accident or mistake, but was the performance actually expected by the other party." *C.R. Pittman Construction Co.*, ASBCA No. 57387 *et al.*, 15-1 BCA ¶ 35,881 at 175,425. The Restatement's standard, quoted above, is "sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and

---

[24] The decision does not use the term "course of dealing," but it seems applicable to this appeal.

other conduct." The unchallenged testimony of TSI's management cited above supports my conclusion that based on DCAA's and DCMA's three full audits and two desk reviews approving TSI's documentation and final rates during 2002 to 2006 was a "sequence of previous conduct," that created a "common basis of understanding" between TSI and DCAA/DCMA that TSI had a reasonable expectation that its cost documentation and DCAA's audits were correct. Mr. Fletcher, CFO, provided credible testimony that he relied on DCAA's 2002 through 2006 audits to set the standard of review for TSI's records (finding 23). Messrs. Benton, TSI's president and owner, and Zysk, COO, likewise provided credible testimony, supported by the record, that TSI provided the same kind of support for its FY 2007 costs as it did for years 2002 to 2006 (findings 11, 14, 22-23, 25). Ms. Winefield's 12 June 2014 email corroborates their testimony (finding 20).

I conclude that all the elements required to prove a course of dealing are satisfied. I must now determine the remedy available to TSI. As the Restatement quoted above indicates, the typical application of course of dealing is contract interpretation. This is not precisely the case here; here I deal with a course of dealing involving TSI's records, audits and final indirect rate determinations. I take at face value DCMA's discussion of the documentation required by FAR 31.205-33(f)(1-3) for professional fees (gov't reply br. at 31-33, 41-43). It may well be that upon closer scrutiny TSI's documentary support for these costs was lacking, but that is not the point. I do not question DCMA's/DCAA's right to apply closer scrutiny to TSI's documentation, I find however that after accepting the exact same documentation for FYs 2002 to 2006, TSI was entitled to notice and time to change its record keeping to satisfy the auditors. This remedy is consistent with our decisions in retroactive disallowance cases. *Blue Cross and Blue Shield Association*, ASBCA No. 53632, 04-1 BCA ¶ 32,413 at 160,449 ("The Government must have 'consistently accepted and allowed' the cost in question and failed to provide the contractor with proper notice that the cost will be disallowed in the future" (citation omitted)); *Peat, Marwick, Mitchell & Co.*, ASBCA No. 29847, 86-2 BCA ¶ 18,915 at 95,400 ("If the guidelines set out above are met, the Government must authoritatively inform the contractor of any subsequent disallowance of the earlier accepted costs...."); *Gould*, 83-2 BCA ¶ 16,676 at 82,981 (the government may not disallow even unallowable costs incurred prior to notice by the government that prior acceptance was rescinded); *Western Electric Co.*, ASBCA Nos. 21294, 21295, 79-1 BCA ¶ 13,550 at 66,384 ("Having given its approval to WECO, approval must remain in effect until notice of its recession is conveyed."). I conclude that the only reasonable remedy is to sustain the appeal and not enforce the COFD's disallowance of FY 2007 costs, contested by TSI,[25] based on the parties' course of dealing over the five years preceding 2007. I

---

[25] Disallowed costs that TSI agrees with are not included in the relief I would grant. For example, TSI agrees with the disallowance of $2,300 for expressly unallowable entertainment costs unrelated to business and these disallowed costs are unaffected

disagree with ACO Cuellar's belief that, absent additional support for the costs from TSI, DCMA lacks discretion to disagree with DCAA (finding 11). The evidence of course of dealing between 2002 and 2006 is overwhelming and DCMA certainly had the discretion, and one might say obligation, to give TSI time to adapt to the new standard being applied. This is particularly true given TSI's warning that DCMA's decision would put TSI out of business, which it apparently contributed to.[26] (Findings 1, 11) The appeal shall be sustained as to the following costs:

| COFD Note | DISALLOWED COSTS |
| --- | --- |
| Note 1 | $51,340 for marketing services provided by SMI (finding 23) |
| Note 2 | $26,198 in computer supplies expenses in 2007[27] (finding 14) |
| Note 5(b) | $2,925 for work performed by Charles Wilson (finding 23) |
| Note 8 | $2,417 in claimed G&A expenses |
| Note 10 | $2,661 in subcontract costs that were not approved in advance[28] |
| Note 11 | $28,568 in subcontract costs that were not approved in advance[29] |

*Costs Excluded from Course of Dealing*

Next I consider individual costs that I do not include in course of dealing.

*Expressly Unallowable Costs*

I do not include costs that were expressly unallowable in the course of dealing costs. *Raytheon Company*, ASBCA No. 57576 *et al.*, 15-1 BCA ¶ 36,043 at 176,051 ("An

by our decision (R4, tab 6(a) at 74, tab 16 at 4, note 3). The same is true of the 80% limitation of recovery of attorney's fees (R4, tab 16 at 5, note 5(a)).

[26] I do not find that DCAA/DCMA put TSI out of business because that matter was not litigated fully.

[27] I included computer supplies in the course of dealing costs, but if I had not, I would still sustain the appeal as to these costs. Mr. Fletcher explained that the computers that were expensed in the year they were purchased were not used on employee desktops, but were heavily modified, sent to be used for field testing and were fully consumed in the year they were purchased, i.e., a useful life of one year (finding 14; app. reply br. at 20). It therefore made perfect sense to expense them and DCAA's insistence that these computers be treated as if they were used on office desktops makes absolutely no sense.

[28] The record as to similar unapproved subcontract costs in 2002 to 2006 is sparse and I rely on TSI witness testimony that TSI made no changes in its procedures in years 2002 through 2007 to include these in the course of dealing costs (findings 22-25). DCMA's discussion of these costs may be correct (gov't reply br. at 43-45), but again misses the point that it varies from the parties' course of dealing.

[29] *See* footnote 27.

'expressly unallowable' cost, by the plain terms of the definition, must be an item of cost or a type of cost that is *specifically named and stated* as unallowable by law, regulation or contract."). The appeal should be denied as to the following costs:

| COFD Note (R4, tab 16) | DISALLOWED COSTS |
|---|---|
| Note 3 | $2,300 entertainment; $304 travel over per diem rates |
| Note 5(a) | $6,886 – 80% limit on attorney's fees |
| Note 5(c) | $706 in legal fees unrelated to TSI |
| Note 5(d) | $1,000 in legal fees to prepare personal tax returns |
| Note 6 | $577 travel over per diem rates |
| Note 9 | $1,074 travel over per diem rates |
| Note 10 | $466 travel over per diem rates |
| Note 11 | $1,986 travel over per diem rates |

*Executive Bonuses*

ACO Cuellar disallowed $29,967[30] ($25,698 Overhead and $4,269 G&A)[31] in executive bonus costs that cannot be included in the course of dealing costs because the bonuses didn't start until 2007 (findings 23-24). I did not include a discussion of the facts surrounding these costs in the Findings of Fact above so I include them here. Starting with a limitation imposed only on the owner, Mr. Benton, that the compensation cannot be a distribution of profit. FAR 31.205-6(6)(ii)(B); *SplashNote Systems, Inc.*, ASBCA No. 57403, 12-1 BCA ¶ 34,899 at 171,610 ("We are not persuaded by SplashNote's argument that the bonuses for the other employees were not questioned whereas Mr. Tse's [majority owner] was; allowability of their bonuses is not restricted by the 'distribution of profits' prohibition, which is limited only to the designated individuals."). In her draft audit report, Ms. Waller found that $6,500 and $406 (year-end) bonuses paid to Mr. Benton were a distribution of profit, "in the absence of a proper employer/employee agreement, and the fact that TSI is an 'S' Corporation,"[32] it is our opinion that the bonuses paid to Mr. Benton were a distribution of profit (R4, tab 53 at 592-93). In her COFD, ACO Cuellar did not adopt Ms. Waller's finding and did not find that any bonuses were a distribution of profit (R4, tab 16 at 259, note 4). However, in its brief the government argues that all $29,967 was a distribution of profit (gov't br. at 60). The government overlooks the fact that this limitation only applies to Mr. Benton's bonuses, something less than the $29,967. The only evidence the government presents to prove that Mr. Benton's

---

[30] Ms. Waller's draft audit report disallowed $39,150 in bonuses. ACO Cuellar apparently determined that some of the bonuses were allowable but the specifics are not readily apparent in the record.

[31] COFD Notes 4 and 7 (finding 15).

[32] The significance of an "S" Corporation is not explained in the record.

bonuses were a distribution of profits was testimony from Mr. Fletcher (gov't br. at 21, ¶¶ 16, 60). When asked if the bonuses came out of company profits, Mr. Fletcher testified, "It has to come out of company profits. I mean, where else would it come from?" (Tr. 2/173-74) The question of distribution of profit is a more complicated matter than simply eliciting such testimony from Mr. Fletcher:

> In *Lulejian and Associates*, the Board looked at several factors to assess when a bonus was actually a distribution of profits: whether any dividends were declared (*i.e.*, whether the bonus was actually a disguised dividend), how large a share of the bonus pool was allocated to the top executive(s), and how "substantial" the rest of the compensation was. *Lulejian and Associates, Inc.*, ASBCA No. 20094, 76-1 BCA ¶ 11,880 at 56,945 (ASPR 15-205.6(a)(2)(i) provided that "Determination should be made that such compensation is reasonable for the actual personal services rendered rather than a distribution of profits"). Because there were no dividends declared, the top four executives garnered 51% of the bonus pool, and their compensation was otherwise substantial, the Board found certain bonus costs unallowable. *Lulejian*, 76-1 BCA ¶ 11,880 at 56,945. Here, like *Lulejian*, SplashNote declared no dividends, and Mr. Tse's share of the bonus money was great—71% (findings 10, 12). Although DCMA determined Mr. Tse's total compensation to be reasonable, the bonus itself still must not be a distribution of profits, and the presence of the other two factors suggests that it was.

*SplashNote*, 12-1 BCA ¶ 34,899 at 171,609-10. Mr. Fletcher's testimony was equivocal, "I mean, where else would it come from?" I do not consider this testimony alone sufficient to prove that the bonuses were a distribution of profit. The government has the burden of proof. The government failed to consider any of the factors discussed above, i.e. "S" Corporation, dividends, share of the pool, how substantial the other compensation was, and what portion of the $29,967 was paid to Mr. Benton. The government failed to meet its burden of proof that Mr. Benton's bonuses were a distribution of profit.

The government correctly points out that FAR 31.205-6(f) governs the allowability of bonuses (gov't br. at 59-60):

> (i) Awards are paid or accrued under an agreement entered into in good faith between the

57

contractor and the employees before the services are rendered or pursuant to an established plan or policy followed by the contractor so consistently as to imply, in effect, an agreement to make such payment; and

(ii) Basis for the award is supported.

FAR 31.205-6(f). TSI's bonus plan was agreed to by Mr. Benton, Mr. Zysk and Mr. Fletcher in late 2006 (tr. 2/192). The written bonus plan, to take effect on 1 January 2007, was signed by Mr. Benton on 1 December 2006 (R4, tab 9(c)). DCMA dismisses this document as, "nothing more than a one-page document which appears to evidence TSI's intent to establish an 'Executive Compensation Plan' effective January 1, 2007" (gov't reply br. at 38). Considering that TSI is a company with less than twenty employees (finding 1) I consider the formality demanded by DCMA unreasonable. There was no written, signed agreement between Mr. Fletcher, Mr. Zysk and Mr. Benton concerning bonuses, however, Mr. Fletcher testified, "It wasn't signed but it was certainly agreed to" (tr. 2/192). The performance metrics included "Orders, Sales, Backlog, Revenue, Overhead Rates, Special Accomplishments, and Successful program management" (R4, tab 9(c)). The government contends that the bonuses are unallowable for five reasons: (1) there is no written (signed) agreement "between TSI and Messrs. Benton, Zysk and Fletcher before the compensation plan became operational or at any time in FY 2007"; (2) there is no "written company plan or policy relating to bonuses that was in effect in 2007"; (3) "TSI also failed to establish that the awards were paid pursuant to an established policy or plan which was consistently followed"; (4) "TSI failed to provide sufficient evidence to support the basis for the awards"; and (5) $15,000 in bonuses paid in March 2008 are not allocable to FY 2007 (R4, tab 16 at 259-60, note 4; gov't br. at 59-60). I consider these reasons in turn. The government does not allege bad faith and there is nothing in the record that would support bad faith. It is true that there is no written agreement signed by Messrs. Benton, Zysk and Fletcher, but the government failed to prove that one was required. FAR 31.205-6(f)(1)(i) does not require a written agreement signed by these three individuals, and the second clause allowing for an implied agreement supports the conclusion that a signed agreement is not absolutely necessary. Mr. Fletcher's testimony that the three executives agreed to the plan in 2006 is undisputed. I find that the agreement existed before performance in 2007 and there is no requirement that their agreement be in writing and signed by the three executives. Second, the government argues the 1 December 2006 Executive Compensation Plan is not a plan because TSI was "going to" establish a plan starting 1 January 2007. This argument is only semantics and does not render the plan meaningless. I find that TSI produced a written bonus plan signed by Mr. Benton on 1 December 2006 commencing on 1 January 2007 (R4, tab 9(c)). Third, I agree that there was no established plan that was consistently followed because the 2007 plan was new. However, this requirement in the second

58

clause of FAR 31.205-6(f)(1)(i) is an alternative to the agreement in the first clause and is therefore not a reason for disallowance. The fourth justification cited by the government is subjective. According to ACO Cuellar's COFD and the government's brief, "TSI did not provide sufficient evidence documenting the basis of the bonus awards" (R4, tab 16 at 259; gov't br. at 60). TSI provided the following four documents: (1) an unsigned one-page memorandum entitled "TSI Bonus Policy" (app. supp. R4, tab 146 at 1); (2) a 30 May 2007 email with bullet comments supporting "a highly successful first quarter of 2007" recommending bonuses of $1,000 each for the three executives (*id.* at 6); (3) a 14 September 2007 memorandum with nine bullet comments supporting the award of bonuses[33] (*id.* at 7); and (4) a 27 February 2008 memorandum with eleven bullet comments authorizing bonuses of $9,000 to Mr. Zysk and $6,000 to Mr. Fletcher for performance for 2007 (*id.* at 8-9). There were also discussions with Messrs. Benton, Fletcher and Zysk.[34] I considered these documents and find that they provide adequate support for the FY 2007 bonuses for three reasons (1) the degree of formality was reasonable for a company with less than twenty employees (finding 1), (2) the fact that Mr. Zysk and Mr. Fletcher worked for salaries "considerably below" their previous salaries (finding 24), and (3) the total sum of the bonuses was modest. Finally, ACO Cuellar disallowed the $15,000 in bonuses paid to Mr. Zysk and Mr. Fletcher because the actual payment was in March 2008. She concluded that the $15,000 was allocable to FY 2008. She apparently gave no weight to the memorandum that authorized the payments based on performance in FY 2007 (app. supp. R4, tab 146 at 8-9). Mr. Fletcher testified that $15,000 was accrued during FY 2007 and actually paid out in early March 2008 (tr. 2/140-41). This was partly because he and Mr. Zysk were traveling in January and February and they didn't get around to paying the bonuses until early March (tr. 2/142). DCMA gives no weight to these facts. I find that TSI's explanation of why the $15,000 was paid in early March was reasonable and that the $15,000 was allocable to FY 2007. I would sustain the appeal as to the disallowance of all of the bonuses.

*Legal Fees for Criminal Investigation*

ACO Cuellar disallowed $27,543[35] in legal fees incurred by TSI to represent its interests during a criminal investigation by the Navy (finding 15). I did not include a discussion of the facts surrounding these costs in the Findings of Fact above so I include them here.

---

[33] The memo refers to the first quarter but the date persuades me that it referred to events up to September 2007.

[34] Ms. Winefield testified that DCAA auditors cannot rely on statements from contractors to verify facts (tr. 1/210-12).

[35] This is 80% of the incurred cost of $34,429 (R4, tab 16 at 260, note 5(a)).

The $27,543 in legal fees that were incurred from 2002 through 2005 to defend TSI's interests during a criminal investigation by the U.S. Naval Criminal Investigative Service (NCIS). The costs were disallowed because ACO Cuellar concluded they were allocable[36] to FY 2006 and should not have been claimed in FY 2007. (R4, tab 16 at 5, note 5(a)) The investigation also included The Kemper Group, Inc. and Sonetech Corporation. The document relied upon to disallow these costs was a 16 March 2005 message from NCIS addressed to Sonetech that stated the investigation was closed (R4, tab 53 at 1278). The message was not provided to TSI at that time and NCIS never sent such a message addressed to TSI. Sonetech sent the 16 March 2005 NCIS message to TSI on 20 June 2006 (*id.*). DCMA's contention, "TSI was notified of the investigation's closure, at the latest, on June 20, 2006" fails to take into consideration that the message was addressed to Sonetech, not TSI (gov't reply br. at 39). ACO Cuellar decided that, based on the 2006 fax from Sonetech to TSI, the costs should have been claimed in FY 2006 (R4, tab 16 at 260, note 5). Mr. Benton explained that he never received a similar notice from NCIS addressed to TSI and wasn't confident the investigation of TSI was closed until an NCIS agent called and asked where to return TSI's documents (tr. 2/234-35). Mr. Benton did not recall the exact date the documents were returned[37] but testified he was not convinced the investigation was over as to TSI until the documents were returned (tr. 2/237). I find that Mr. Benton's uncertainty was caused by NCIS' failure to address a message directly to TSI informing it that the investigation as to TSI was closed. I will not penalize TSI due to the NCIS' failure. I find that Mr. Benton's explanation is credible[38] and it was reasonable for him to consider the investigation of TSI, as opposed to Sonetech, might remain open, in the absence of an NCIS message addressed to TSI. There is no question that TSI incurred the costs. I also note that DCMA's argument seems to be influenced by the cost to the government rather than if TSI's actions were reasonable under the circumstances, "[h]ad TSI properly claimed the expenses in FY 2006, the amount that would have been allowable would have been significantly less than in FY 2007 because the Government participation in TSI's G&A pool represented a smaller portion of TSI's base in 2006" (gov't reply br. at 40-41). I would sustain the appeal of the disallowance of $27,543 in legal fees to defend TSI during the NCIS investigation.

---

[36] ACO Cuellar did not find that the costs were unallowable.

[37] Mr. Benton submitted an FOIA request in 2015 (R4, tab 149) to find the date the documents were returned but never received a response (tr. 2/235-36; ex. A-3).

[38] The COFD note 5a. states that TSI (Mr. Fletcher) said it "forgot" to claim the costs in 2006, but Mr. Fletcher disputes that statement (tr. 2/212; R4, tab 16 at 5). The evidence is insufficient for me to find that TSI "forgot" to claim the costs in 2006 or that it would matter if true.

## CONCLUSION

The appeal should be sustained as explained above. The demand for $159,303 should be reduced accordingly.

Dated: 12 January 2017

_CRAIG S. CLARKE_
CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59577, Appeal of Technology Systems, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

61